CALIFORNIA MEDICAL PRODUCTS,
INC., Plaintiff,

v.

TECNOL MEDICAL PRODUCTS,
INC., Defendant.

Civil A. No. 91–620–LON.

United States District Court,
D. Delaware.

Dec. 29, 1995.

Josy W. Ingersoll, of Young, Conaway, Stargatt & Taylor, Wilmington, Delaware; Of Counsel: Albert J. Breneisen, and Frank Pietrantonio, of Kenyon & Kenyon, Washington, D.C., for Plaintiff California Medical Products, Inc.

Donald F. Parsons, Jr., Mary B. Graham, and Julia Heaney, of Morris Nichols Arsht & Tunnell, Wilmington, Delaware; Of Counsel: Barbara M.G. Lynn, of Carrington, Coleman, Sloman & Blumenthal, L.L.P., Dallas, Texas, for Defendant Tecnol Medical Products, Inc.

LONGOBARDI, Chief Judge.

## I. *NATURE AND STAGE OF THE PROCEEDINGS*

Plaintiff California Medical Products, Inc. ("CalMed"), also known as Laerdal California, commenced this action for patent infringement on November 18, 1991. CalMed alleges that defendant Tecnol Medical Products ("Tecnol") manufactures and sells a cervical collar, the 911 First Response Col-

lar (the "911 collar"), which infringes U.S. Patent Re. 32,219 (the '219 patent) both literally and under the doctrine of equivalents. Through its answer and counterclaim for declaratory relief, Tecnol denies that it infringes the '219 patent and alleges as affirmative defenses that the '219 patent is invalid and unenforceable on various grounds.

Tecnol has also counterclaimed alleging that CalMed violated 35 U.S.C. § 292 by falsely marking its own cervical collars as patented using the label "Patent No. RE 32,219" between November 8, 1987 and February 22, 1991 while the patent had lapsed. CalMed denies Tecnol's false marking allegations. Tecnol also seeks a declaratory judgment that a new version of the 911 collar (the "modified 911 collar") does not infringe the '219 patent either literally or under the doctrine of equivalents. CalMed contends that the modified 911 collar infringes the '219 patent under the doctrine of equivalents.

On November 8, 1983, U.S. Patent No. 4,413,619 (the '619 patent), entitled "Portable Cervical Collar" was issued to Geoffrey C. Garth. The application for the '619 patent was filed on October 16, 1981. On February 10, 1984, Garth filed an application for reissue of the '619 patent. On August 5, 1986, the '219 reissue patent, also entitled "Portable Cervical Collar," was issued to Garth based upon the reissue application. Garth was the sole inventor of and applicant for the '619 and '219 patents. The '219 patent lapsed in November, 1987 following Garth's failure to pay the required maintenance fee. On or about May 17, 1989, Garth executed an assignment of the '219 patent to CalMed. Following Garth's petition for reinstatement, the Patent and Trademark Office ("PTO") reinstated the patent on February 22, 1991.

Following oral argument on motions for summary judgment, the Court found that pursuant to 35 U.S.C. § 41(c)(2) CalMed was precluded as a matter of law from recovering any damages for any infringement by Tecnol occurring during the time period that the '219 patent had lapsed. In addition to these mandatory statutory intervening rights, Tecnol contends that it is entitled to equitable intervening rights allowing it to continue to make, use, or sell the 911 collar even after the reinstatement of the '219 patent. CalMed disputes that such equitable relief is appropriate.

A nine day non-jury trial yielded a transcript of 2,223 pages. In addition, the parties designated over 1,660 pages of deposition testimony and approximately 300 exhibits were received into evidence. The parties have submitted post-trial briefing and proposed findings of fact and conclusions of law.[1]

This Court has jurisdiction over the subject matter of the claims and counterclaims of this action pursuant to 28 U.S.C. § 1331, § 1338(a), § 2201, and § 2202.

This Memorandum Opinion represents the Court's findings of fact and conclusions of law with respect to all issues.

## II. TECHNOLOGICAL BACKGROUND

The technology at issue in this case involves cervical collars which are utilized to restrict the motion of a patient's head and neck. Cervical collars are utilized both before ("pre-hospitalization" or "extrication" collars) and after ("post-hospitalization" collars) a patient is hospitalized. At an accident scene it is not possible for emergency per-

---

1. Each party was responsible for initiating briefing on those issues for which they bear the burden of proof. In addition, Tecnol initiated briefing prior to trial in support of its contention that the '219 patent was improperly reinstated by the PTO. The Court will use the following abbreviations in citations to the parties' post-trial submissions:

 CMOB—CalMed's Opening Post–Trial Brief, D.I. 146.

 TAB—Tecnol's Responsive (Answering) Post–Trial Brief, D.I. 147.

 CMRB—CalMed's Reply Post–Trial Brief, D.I. 148.

 TOB—Tecnol's Opening Post–Trial Brief, D.I. 149.

 CMAB—CalMed's Responsive Post–Trial Brief, D.I. 150.

 TRB—Tecnol's Reply Post–Trial Brief, D.I. 151.

 CMCL—CalMed's Proposed Conclusions of Law, D.I. 144.

 CMFF—CalMed's Proposed Findings of Fact, D.I. 144.

 TCL—Tecnol's Proposed Conclusions of Law, D.I. 145.

 TFF—Tecnol's Proposed Findings of Fact, D.I. 145.

sonnel to fully evaluate the condition of a patient's neck and spine. It is necessary, therefore, to immobilize the patient's neck to prevent further injury. Extrication collars are used by paramedics to minimize the motion of a patient's neck while administering initial treatment, extricating the patient from, for example, automobile wreckage, and transporting the patient to the hospital.

The 911 collar, the modified 911 collar, the Stifneck collar (the extrication collar marketed by CalMed), and the collar claimed in the '219 patent all accomplish significant immobilization of the patient's neck. Without preempting or prejudicing the Court's claim construction and infringement analysis, neither side could disagree that there are some obvious similarities between these collars. All obtain the desired immobilization by utilizing a structure which encircles the patients neck and an attached structure which supports the patients chin. These structures are comprised of material which can be described as stiff yet flexible.[2] The Court will refer in this Memorandum Opinion to the portion of a cervical collar which encircles the patient's neck as the "band," and the portion of the collar which supports the patients chin as the "chin support brace."

Post-hospitalization collars differ from extrication collars in that they are often constructed out of softer materials, such as foam rubber and thus do not provide the same degree of immobilization as extrication collars. While the distinction between extrication collars and post-hospitalization collars is useful in obtaining an understanding of the cervical collar industry it is not a distinction that is of significance in resolving infringement and validity issues, because the claims of the '219 patent do not explicitly distinguish between these two categories of cervical collars. The accused collars do not infringe simply because they can be characterized as extrication collars, and relevant prior art does not become irrelevant simply because it can be characterized as a post-hospitalization collar.

The 911 collar, [Plaintiff's Trial Exhibit ("PX") 3] is comprised of three main structural pieces: two band sections, which the Court will refer to as the front band section and the back band section, and a chin support brace. The front band section is comprised of three layers of material. The top layer is a gray, stiff flexible material. The middle layer is a thin layer of plastic which is a lighter shade of grey. The middle layer is the same shape and size as the top layer. The bottom layer is a soft white foam which extends beyond the bottom edge of the first two layers, thus providing additional padding for the comfort of the patient. The front band section has a hole in the middle, referred to as a "trach hole," which allows medical personnel to perform a surgical procedure to provide an airway through the trachea while the patient is wearing the collar.

The back band section and the chin support brace lack the middle plastic layer found in the front band section. The grey material and the white foam are the same shape and size in the chin support brace. The white foam material extends beyond the top and bottom edges of the grey material in the back band section, again to provide additional padding for the comfort of the patient.

The chin support brace is permanently attached to the front band section by plastic "rivets" located at each end of the chin support brace. A small tab extends upward from the center of the top edge of the front band section and this tab is permanently attached to the center of the chin support brace with a rivet. The tab is formed from the same three layers of material as the front band section and is in fact part of the front band section.

A strip of blue velcro-like fabric is permanently attached to the back band section by two rivets. This strip extends several inches beyond each end of the back band section. The front band section has mutually cooperative velcro strips which are attached to the

**2.** At trial Mr. Garth provided a succinct demonstration of how material may be stiff yet flexible. Mr. Garth folded an ordinary piece of paper into a cylinder and then balanced the Court's Bible on the paper cylinder, thus demonstrating that the paper was flexible because it could be formed into a tube, yet was stiff because it could support the Bible. [Garth Tr. at 371–72].

front band section by some sort of adhesive and by rivets.

One side of the front band section has a slot approximately one and three-quarters of an inch long and one-quarter inch wide cut through the velcro strip and the three layers of the front band section. A rivet extends through this slot and permanently attaches the front band section to the back band section. Plastic washers are used at either end of this rivet, apparently to provide additional support for this connection and to make it more difficult for the snap fastener to be accidentally pulled through the slot. This particular snap fastener is referred to by Tecnol as the "sizing post." The construction of the 911 collar is such that after the release of the velcro fasteners the back band section may be rotated around the sizing post, thereby allowing the back band section to be positioned directly behind the front band section, providing for compact storage.

The 911 collar is applied to the patient by first rotating the back band section out of its compact storage alignment. After checking to ensure that the sizing post is centered and the velcro is fastened over the sizing post, the chin support brace is positioned underneath the patient's chin, and the back band section is then slid behind the patient's neck. The ends of the front band piece and the back band piece are positioned so that they overlap. The circumference of the collar may be adjusted at this side by varying the amount of the overlap. The velcro retention means are then attached thereby closing the collar around the patient's neck. If desired, the velcro may then be unfastened from the sizing post side of the collar and the collar may be adjusted by sliding the sizing post along the slot. The velcro is then reattached over the sizing post side thereby holding the sizing post in place.

The modified 911 collar, [PX 178], differs from the 911 collar mainly with respect to the chin support brace. The modified 911 chin support brace is produced in a thermoforming process and is not die cut as is the 911 chin support brace. The modified 911 does not have a tab extending up from the top edge of the front band section which is permanently attached to the chin support brace. Finally, the location of the snap fasteners which permanently attach the chin support brace to the front band section differ from the 911 collar.

## III. INFRINGEMENT ANALYSIS

### A. Legal Standards

Title 35 U.S.C. § 271(a) provides in part:

> [W]hoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent.

35 U.S.C. § 271 (1984 & Supp.1995). According to the Federal Circuit, the "issue of infringement raises at least two questions: (1) what is patented, and (2) has what is patented been made, used or sold by another." *Fromson v. Advance Offset Plate, Inc.,* 720 F.2d 1565, 1569 (Fed.Cir.1983); *see also Rawlplug Co. v. Illinois Tool Works, Inc.,* 11 F.3d 1036, 1041 (Fed.Cir.1993); *ZMI Corp. v. Cardiac Resuscitator Corp.,* 844 F.2d 1576, 1578 (Fed.Cir.1988); *American Standard Inc. v. Pfizer Inc.,* 722 F.Supp. 86, 92 (D.Del. 1989). Thus, the resolution of the issue of infringement is a two-step process. First, a court must determine the scope of the claims of the patent. *Mobil Oil Corp. v. Amoco Chemicals Corp.,* 779 F.Supp. 1429, 1442 (D.Del.1991), *aff'd,* 980 F.2d 742 (Fed.Cir. 1992). Then, once the scope of the claims is ascertained, the court must determine whether the defendant's allegedly infringing activity falls within the scope of the claims. *Id.* Claim construction is a question of law. *Markman v. Westview Instruments,* 52 F.3d 967, 969 (Fed.Cir.1995) (en banc), *cert. granted* ── U.S. ──, 116 S.Ct. 40, 132 L.Ed.2d 921 (1995); *Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d 861, 866 (Fed.Cir.1985); *Fromson,* 720 F.2d at 1569; *Mobil,* 779 F.Supp. at 1442. The determination of whether a patented invention has been made, used or sold by another is a question of fact. *Fromson,* 720 F.2d at 1569. A plaintiff must establish infringement by a preponderance of the evidence. *Phillips Petroleum Co. v. United States Steel Corp.,* 673 F.Supp. 1278, 1344

(D.Del.1987), *aff'd,* 865 F.2d 1247 (Fed.Cir. 1989).

### 1. *Claim Construction*

■ To determine the "true meaning" of a disputed claim, a Court must examine: 1) the claim at issue; 2) the specification, and 3) the prosecution history. *Markman,* 52 F.3d at 979; *ZMI Corp.,* 844 F.2d at 1579; *Loctite,* 781 F.2d at 867; *American Standard,* 722 F.Supp. at 92.

#### a. *Claim Language*

■ A patent claim typically has three parts: 1) the preamble; 2) the transition; and 3) the body. 2 Donald S. Chisum, *Patents* § 806[1][b] (1994). The preamble is "an introductory phrase that may summarize the invention, its relation to the prior art, or its intended use or properties." *Id.* It may also constitute a limitation on a claim. *Id.* The transition is a phrase containing a term such as "comprising" that serves to connect the preamble to the body of the claim. *Id.* The third part of a patent claim, the body, is composed of the recitation of the elements and limitations that "define the product or process to be encompassed within the patent monopoly." *Id.*

■ The terms of a claim must be given their ordinary meaning, unless it appears that the inventor used them differently. *ZMI Corp.,* 844 F.2d at 1579. In this regard, the Federal Circuit has recently stated that:

[T]he focus in construing disputed terms in claim language is not the subjective intent of the parties to the patent contract when they used a particular term. Rather the focus is on the objective test of what one of ordinary skill in the art at the time of the invention would have understood the term to mean.

*Markman v. Westview Instruments, Inc.,* 52 F.3d at 986.

#### b. *The Specification*

■ It is well established that "[p]atent law allows an inventor to be his own lexicographer." *ZMI Corp.,* 844 F.2d at 1580. The description of terms in the specification "may act as a sort of dictionary, which explains the invention and may define terms used in the claims." *Markman,* 52 F.3d at 967. "[W]ords must be used in the same way in both the claims and the specification.'" *ZMI Corp.,* 844 F.2d at 1580 (quoting *Autogiro Co. of America v. United States,* 181 Ct.Cl. 55, 384 F.2d 391, 397 (1967)). Generally speaking, however, "particular limitations or embodiments appearing in the specification will not be read into the claims," *Loctite,* 781 F.2d at 867, because it is the claims, not the specification, that "delimit the right to exclude" under the patent, *Markman,* 52 F.3d at 980.

#### c. *The Prosecution History*

■ To interpret disputed claim language, the Court should also look to the prosecution history, which may be used by the Court as a tool to determine the "true meaning of language used in the patent claims." *Markman,* 52 F.3d at 980. "'The prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance.'" *ZMI Corp.,* 844 F.2d at 1580 (quoting *Standard Oil Co. v. American Cyanamid Co.,* 774 F.2d 448, 452 (Fed.Cir.1985)). However, "[a]lthough the prosecution history can and should be used to understand the language used in the claims, it too cannot 'enlarge, diminish or vary' the limitations in the claims." *Markman,* 52 F.3d at 981 (citations omitted).

#### d. *Extrinsic Evidence*

"Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.... Extrinsic evidence is to be used for the court's understanding of the patent, not for the purpose of varying or contradicting the terms of the claims." *Markman,* 52 F.3d at 980–81.

### 2. *Comparison of Claims with Accused Products–Literal Infringement*

■ Once the scope of the claims is ascertained, the Court must determine whether the defendant's allegedly infringing

activity falls within the scope of the claims. *Mobil Oil Corp. v. Amoco Chemicals Corp.*, 779 F.Supp. 1429, 1442 (D.Del.1991), *aff'd* 980 F.2d 742 (Fed.Cir.1992). The determination of whether a patented invention has been made, used or sold by another is a question of fact. *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1569 (Fed.Cir.1983); *see also Rawlplug Co. Inc. v. Illinois Tool Works, Inc.*, 11 F.3d 1036, 1041 (Fed.Cir. 1993); *ZMI Corp. v. Cardiac Resuscitator Corp.*, 844 F.2d 1576, 1578 (Fed.Cir.1988); *American Standard Inc. v. Pfizer Inc.*, 722 F.Supp. 86, 92 (D.Del.1989). If every limitation of a claim is found in the accused device, it is literally infringed. *Uniroyal, Inc. v. Rudkin–Wiley Corp.*, 837 F.2d 1044, 1054–55 (Fed.Cir.1988). A plaintiff must establish infringement by a preponderance of the evidence. *Phillips Petroleum Co. v. United States Steel Corp.*, 673 F.Supp. 1278, 1344 (D.Del.1987), *aff'd* 865 F.2d 1247 (Fed.Cir. 1989).

B. *Discussion—Claim Construction and Literal Infringement*

CalMed contends that the 911 collar literally infringes the '219 patent but concedes that the modified 911 collar does not. The Court's findings regarding literal infringement by the 911 collar apply equally to the modified 911 collar except where the Court specifically recognizes a difference between the two collars which is relevant to the Court's literal infringement analysis.

Claim construction does not occur in a vacuum. It is the rare case where the parties dispute the meaning of every term in the claims. This case is representative of the more common situation in which the parties dispute, as a matter of law, the meanings of certain terms that may well be dispositive when the analysis then turns to the factual comparison of the properly construed claims with the accused products. While literal infringement involves an element-by-element comparison of the patent claims with the accused products, the parties have not taken this approach in their post-trial briefing.

Rather, the parties have only focused on these certain disputed elements. For purposes of this Memorandum Opinion, the Court assumes that these briefed issues are dispositive of the question of literal infringement.

1. *Independent Claim 1*

Claim 1 of the '219 patent claims:

A cervical collar formed entirely of [a stiff, flexible flat plastic sheet band having an asymmetrical configuration comprising]:

(a) an elongated neck encircling band formed *entirely* of [said] stiff, flexible *plastic* sheet material having front, [and back] side *and opposite side* portions;

(b) a chin support brace, also formed entirely of stiff flexible plastic sheet material having a generally C–shape including fastening means located on each end of said brace;

(c) said chin support brace fastening means being engageable with cooperative attachment means located at least on opposite [sides] *side portions* of said neck encircling band such that when said band is formed into said collar at least one of said fastening means is allowed to align with a respective attachment means thus bowing said brace thereby enabling said brace to obtain an upwardly inclined, conically convex chin rest supported along its entire length by the upper edge of the front portion of said band and projecting forwardly therefrom; and

(d) collar retention means carried at each end of said band and mutually cooperative to retain said band in its collar configuration.[3]

[PX 520 at 4/19–42].

The claim construction issues with respect to Claim 1 are (1) whether claim 1 discloses a cervical collar that is limited to a "flat, two-dimensional chin brace and neck encircling band that are *transformable by the user, after manufacture,* between two-dimensional and three-dimensional configurations." [TOB at 5 n. 2 (emphasis added), *see also*

---

**3.** The bracketed text indicates language that was in the '619 patent and was removed for the '219 reissue patent. The underlined text indicates language that was added during the prosecution of the '219 patent.

TAB at 10–11]; (2) the meaning of the terms "encircling" and "band" and "entirely" in the phrase "an elongated neck encircling band formed entirely of stiff plastic sheet material having front, side, and opposite side portions"; and (3) the meaning of the limitation requiring that the chin support brace be "supported along its entire length by the upper edge of the front portion" of the neck encircling band.

### a. Transformability—Limitation or Additional Feature?

Tecnol contends that the language of claim 1, the specification, the prosecution history, and the prior art all limit claim 1 to a manufactured device that is capable of transforming from an essentially two-dimensional flat storage configuration to a three-dimensional formed collar.[4] Tecnol used the example of a folding chair to explain its transformability argument: "in a claim directed to a folding chair, the capability of the chair to transform from a flat, storage configuration to a three-dimensional chair configuration would be an essential element of the claimed invention." [TAB at 14].

Tecnol's folding chair hypothetical assumes that the hypothetical claim would contain language directed to transformability. CalMed does not dispute that the preferred embodiment described in the specification is a cervical collar that is transformable by the user. CalMed also does not dispute that the highly successful Stifneck collar is transformable by the user. CalMed contends, however, that independent claim 1 is not limited solely to cervical collars with this novel ability to transform. CalMed submits that claim 1 describes a cervical collar with a novel structural relationship between collar and chin support, regardless of whether the cervical collar is transformable or not. Under CalMed's interpretation of independent claim 1, transformability is merely an additional feature of the Stifneck vis-a-vis claim 1, albeit an attractive, useful and novel one.

One must keep in mind that "[w]ords in a claim 'will be given their ordinary and accustomed meaning, unless it appears that the inventor used them differently.'" *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 759 (Fed.Cir.1984) (quoting *Universal Oil Prods. Co. v. Globe Oil & Refining Co.*, 137 F.2d 3, 6 (7th Cir.1943), *aff'd* 322 U.S. 471, 64 S.Ct. 1110, 88 L.Ed. 1399 (1944)). Tecnol claims that subparagraphs (a) and (b) of claim 1, which claim a neck encircling band and a chin support that are "formed entirely of stiff flexible plastic sheet material" indicate that these components must have the capability to lay flat. The Court finds that this language is merely descriptive of the types of materials claimed, and subparagraphs (a) and (b) disclose nothing about how or when these originally flat components are formed into a three-dimensional configuration.

Subparagraph (c), which describes how the components described in subparagraphs (a) and (b) interact to form a collar, contains the language critical to the transformability dispute:

> (c) said chin support brace fastening means *being engageable* with cooperative attachment means located at least on opposite [sides] side portions of said neck encircling band such that *when said band is formed* into said collar at least one of said fastening means *is allowed to align* with a respective attachment means *thus bowing* said brace *thereby enabling said brace to obtain* an upwardly inclined, conically convex chin rest supported along its entire length by the upper edge of the front portion of said band and projecting forwardly therefrom;

[PX 520 at 4/19–42 (emphasis added) ].[5]

The portions of subparagraph (c) underlined above do describe an orientation of the band and the chin support brace, but say nothing about when the orientation occurs, or

---

**4.** For ease of reference the Court uses the terms "transformability" or "transformable by the user" as shorthand for this argument.

**5.** Subparagraph (d) describes the means by which the ends of the band are attached to form the collar and is not in dispute in this case:

> (d) collar retention means carried at each end of said band and mutually cooperative to retain said band in its collar configuration.

who is to perform it. To find that "when said band is formed" means "when said band is formed by the user at some point after manufacture" would be to impermissibly import a limitation into the claim which is not supported by the language of the claim. In an attempt to circumvent this problem, Tecnol makes a number of arguments directed to the specification and the prosecution history.

Tecnol argues that the specification describes a collar which is transformable by the user through use of language such as "the entire collar can be unfolded into a flat position" and drawings which are described as illustrating the collar "in its unassembled or portable configuration as it would be carried by paramedics in a portable pack or a mobile paramedic unit." [PX 520, 3/48–49, 1/59–61]. The specification also concludes, however, with a rather standard disclaimer:

> The invention has been described with reference to the illustrated and presently preferred embodiment. It is not intended that the invention be limited by this description of preferred embodiments. Instead, it is intended that the invention be defined by the means, and the obvious equivalents, set forth in the following claims.

[*Id.* at 4/11–17].

The specification may help to define terms because words must be used in the same way in both the claims and the specification, but particular limitations or embodiments appearing in the specification must not be read into the claims. The only terms potentially relating to transformability which are especially defined in the specification are the "fastening means" located on the chin support and the corresponding "cooperative attachment means" located on the neck encircling band. The engageable fastening means and cooperative attachment means of subparagraph (c) must be interpreted as a means-plus-function element because the claims recite no structure for these means.[6] Means-plus-function elements restrict claim

coverage. *Valmont Indus., Inc., v. Reinke Mfg. Co.,* 983 F.2d 1039 (Fed.Cir.1993). Under § 112 ¶ 6, a claim containing such an element covers only (1) the identical function claimed by the patentee and (2) the structure disclosed in the patent specification or its equivalents. *Intel Corp. v. United States Int'l Trade Comm'n,* 946 F.2d 821, 841–42 (Fed.Cir.1991).

The means-plus-function elements of paragraph (c) perform the function of fastening, aligning, and bowing the chin support brace, but once again, paragraph (c) contains no requirement that these functions be performed at a certain time and contains no requirement that these functions be reversible.

A comparison of the claim language with the chin support fastening and attachment structures disclosed in the specification supports this conclusion. Paragraph (c) requires at least two fastening means, which attach on opposite sides of the neck encircling band. Paragraph (c) makes no distinction between these two fastening means, i.e., the language does not state any way in which the fastening means and attachment means on one side must be different from the fastening means and attachment means on the other side. The specification, however, discloses both a structure by which the chin support may be permanently fastened, and a structure by which the chin piece may be taken from an unfastened state to a fastened state. The chin support may be permanently attached to the collar with a "rivet or snap fastener." [PX 520, 2/49–51]. Alternatively, the chin support may be taken from an unfastened state to a fastened state by means of a snap fastener interacting with a cooperative aperture located on the neck encircling band. While in the preferred embodiment a different structure is used on each side of the chin support, this is not a requirement of the claims. So far as the claims are concerned, both sides of the chin support brace could contain either structure.

---

**6.** 35 U.S.C. § 112 ¶ 6 provides that:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof,

> and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

■ In addition, CalMed contends that interpreting claim 1 as requiring transformation by the user is inconsistent with the doctrine of claim differentiation, because a dependent claim already contains this limitation. The doctrine of claim differentiation is a canon of claim construction which holds that when a patent contains both broad and narrow claims, the additional limitation of the narrow claim should not be read into the broad claim. *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 987 (Fed.Cir.1988); *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1570 (Fed.Cir.1983). "The doctrine embodies the common sense notion that ordinarily language of one claim should not be so interpreted as to make another claim, such as a claim dependent on the first claim, identical in scope." 4 Donald S. Chisum, *Patents* § 18.03[6] at 18–70 (1994).

Claim 8, which depends from independent claim 1, claims:

8. The cervical collar of claim 7 [which depends from claim 1] wherein one end of said chin support brace is permanently secured to one side of said neck encircling band and includes detachable means for connecting its opposite end to the opposite side of said neck encircling band during assembly of said collar whereby said chin support brace can be unfolded into a flat configuration and folded and secured into said conically convex shape.

[PX 520 at 6/6–13 (bracketed text added) ].

CalMed contends that claim 8 contains the transformability limitation and for that reason such a limitation may not be read into claim 1. In response, Tecnol submits the doctrine of claim differentiation is inapplicable because sufficient differences exist between claim 1 and claim 8 even if claim 1 is interpreted so as to contain a transformability limitation. First, Tecnol asserts that claim 1 does not contain claim 8's requirement that one of the fastening means be permanently attached. Second, Tecnol contends that Claim 8 requires a fastening means that can fasten and unfasten repeatedly, while claim 1 is broader because it does not contain such a limitation and covers a collar which transforms once and then cannot for all practical purposes be disassembled.

In response, CalMed asserts that the doctrine of claim differentiation does not fall by the wayside simply because Tecnol can find one potential difference between its interpretation of independent claim 1 and dependent claim 8. CalMed relies upon *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1122 (Fed.Cir.1985), in which the Federal Circuit found that the district court erred in using the specification to read limitations into a claim, claim 1, that were already present in another claim, claim 3. CalMed states in their reply brief that there were "a number of differences" between independent claim 1 and dependent claim 3 and that the Federal Circuit "found it was improper to read any-one of the elements in claim 3 into claim 1." [CMRB at 6 n. 3]. While there may in fact have been a number of differences between these two claims, the portion of the Federal Circuit decision cited by CalMed was addressed solely to the fact that a single limitation present in claim 3, "the vertical limitation", had been improperly read into claim 1 via the specification. The Federal Circuit rested its decision on an examination of the specification, the prosecution history, and the claim language, but did not specifically analyze the existence or non-existence of other differences between the claims.

■ The doctrine of claim differentiation is of vital importance, as indicated by the Federal Circuit:

[T]he [doctrine of claim differentiation] is far more than "general." It is fixed. It is long and well established. It enjoys an immutable and universally applicable status comparatively rare among rules of law. Without it, the entire statutory and regulatory structure governing the drafting, submission, examination, allowance, and enforceability of claims would crumble.

*D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1574 (Fed.Cir.1985). It seems to this Court that the doctrine does not become inapplicable simply because a party can conjure a distinction between two claims, as Tecnol argues. Nor does the doctrine automatically prevent a limitation from existing in an independent claim simply because the limitation appears in a dependent claim, as CalMed

contends. Rather, the true test must be that claims are defined and construed as they were drafted by the patent holder in light of the claim language, the specification, and the prosecution history. Where the specification or prosecution history provide a basis for reading a limitation into a claim, the presumption provided by the doctrine of claim differentiation may be overcome. *See Tandon Corp. v. U.S. Int'l Trade Comm'n,* 831 F.2d 1017, 1023–24 (Fed.Cir.1987); *Jonsson v. Stanley Works,* 903 F.2d 812, 820 (Fed.Cir. 1990) (Federal Circuit found it unnecessary to review doctrine of claim differentiation argument because district court's finding that claim contained a limitation also existing in a separate dependent claim was supported by the prosecution history, the patent, the specifications, and deposition testimony.); *Autogiro Co. of America v. United States,* 181 Ct.Cl. 55, 384 F.2d 391, 404 (1967) ("Claim differentiation is a guide, not a rigid rule. If a claim will bear only one interpretation, similarity will have to be tolerated.")

In the case *sub judice,* however, The Court need not resolve the claim differentiation dispute because 1) the Court finds, as discussed above, that the plain language of the claims and the specification do not support reading a transformability limitation into claim 1, and 2) the Court finds, as discussed below, that the prosecution history likewise does not support the inclusion of a transformability limitation in claim 1.

Tecnol contends that Garth[7] argued on numerous occasions during the prosecution of his application that his invention was unique because it had the capability of being transformed by the user from a flat storage configuration into a three-dimensional configuration. CalMed does not dispute that such arguments were made, but contends that transformability by the user is merely one of many distinctions that were made by Garth during the patent prosecution, and that such arguments are irrelevant because they were never incorporated as limitations into the language of the claims. CalMed contends that "[t]he prosecution history reveals that the Patent Office understood that Garth was claiming ... a cervical collar that has a unique relationship between the chin support brace and neck encircling band." [CMOB at 10]. This dispute may only be resolved through a detailed analysis of the prosecution history of the '619 and '219 patents.

In Garth's original application claim 1 stated:

1. A cervical collar formed of a stiff, flexible sheet band comprising:

(a) an elongated neck encircling band formed of stiff, flexible sheet material having a front side and back portions;

(b) a chin support brace, also formed of stiff flexible sheet material having a generally C-shape;

(c) chin support brace fastening means distally engageable with opposite ends of said chin support brace and cooperative attachment sites on opposite sides of said neck encircling band when said band is formed with said collar; and

(d) collar retention means carried at each end of said band and mutually cooperative to retain said band in its collar configuration.

[PX 521 at 14[8]].

In the original application, dependent claim 9 was the forerunner of dependent claim 8 in the '219 reissue patent:

9. The cervical collar of claim 8 [which depends from claim 1] wherein one end of said chin support brace is secured to one side of said neck encircling band and includes means for connecting its opposite end to the opposite side of said neck encircling band during assembly of said collar.

[*Id.* at 15].

The examiner rejected all of the claims on a combination of obviousness and anticipation grounds. [*Id.* at 19–23]. The examiner made specific rejections based upon the inad-

---

7. The Court is aware that much of the prosecution of the '619 and '219 patents was performed by Garth's patent attorney, Robert E. Strauss. For ease of reference, however, the Court will refer to the prosecution as having been undertaken by Garth, who of course is bound by the prosecution history amendments and claims as drafted by Strauss.

8. The '619 prosecution history has been paginated by counsel for ease of reference.

equate disclosures concerning the chin piece and the fastening means [*Id.* at 22–23].

In response, Garth submitted an amendment containing revised claims, including an amended claim 1 and dependent claim 9, now renumbered as claim 8.

1. A cervical collar formed entirely of a stiff, flexible *flat plastic* sheet band comprising:

(a) an elongated neck encircling band formed of *said* stiff, flexible sheet material having [a] front side and back portions;

(b) a chin support brace, also formed of stiff *flexible plastic* sheet material having a generally C–shape;

(c) chin support brace fastening means distally engageable with opposite ends of said chin support brace and cooperative attachment sites on opposite sides of said neck encircling band when said band is formed *into* [with] said collar *to secure said brace into an upwardly inclined, conically convex chin rest supported along its entire length by the upper edge of the front portion of said band and projecting forwardly therefrom;* and

(d) collar retention means carried at each end of said band and mutually cooperative to retain said band in its collar configuration.

8. The cervical collar of claim [8] 5[9] wherein one end of said neck encircling band is *permanently* secured to one side of said neck encircling band and includes *detachable* means for connecting its opposite end to the opposite side of said neck encircling band during assembly of said collar *whereby said chin support brace can be unfolded into a flat configuration and folded and secured into said conically convex shape.*

[*Id.* at 25–27 (underlined text and bracketed text indicate language added and deleted in amendment) ].

At this point in time, claim 1 was clearly distinct from claim 8, which described fastening means which allowed repeated transfor-

mation by a user. Claim 1 did not contain such a limitation.

In his remarks, Garth first stated "Claim 1 has been amended to incorporate the significant features of applicant's invention and to distinguish the claim over the prior art." After a brief explanation of the difference between claim 1 and claim 4, the other independent claim, he then proceeded to make a number of general comments regarding his invention. According to Garth, the significant aspects of his invention were that:

1. "the collar can be unfolded into a flat or substantially two-dimensional shape;"

2. "the collar is formed entirely of plastic, radiolucent material;"

3. "the collar controls flexion ... and ... immobilizes the head by preventing rotational and lateral movement;" and

4. "[a]nother feature, emphasized in claim 4 and its dependents, is that the collar is asymmetric and attaches to one side of the patient rather than in back of the patients neck."

[*Id.* at 28].

Next, Garth described the nature of the chin support structure "when attached at its opposite ends to the collar," but made no statements regarding when that attachment was to take place. [*Id.* at 29]. Garth further demonstrated the chin support structure by directing the examiner to a brochure for the Stifneck collar, Garth's commercial product. The brochure demonstrated how the Stifneck could be transformed by a user, but this was not the purpose for which Garth directed the examiner to the brochure.

Garth summarized the examiner's grounds for rejecting each of the claims as either anticipated by prior art or obvious in light of the prior art or both, and then proceeded to distinguish his invention over these prior art references. In doing so, Garth used a mix of the above listed arguments. Garth did not rely solely upon the foldability distinction in distinguishing any prior art reference, and in fact Garth did not raise the foldability dis-

9. At this point during the prosecution history, claim 5 further depended from independent claim 4, not claim 1. The differences between claims 1 and 4, however, relate only to the na-

ture of the neck encircling band. Claims 1 and 4 contain identical language on the disputed issue of transformability.

tinction with respect to each prior art reference, although it would have been a valid distinction over each. In distinguishing each prior art reference, Garth did not attempt to distinguish his invention on a claim by claim basis, but rather left it up to the examiner to deduce how these arguments justified each claim.

Read in the context of the entire amendment, the Court views Garth's comments regarding foldability being simply one argument that was advanced. These comments were not made in support of any one particular claim, but rather were just one part of a global response to the examiner's global rejection of each and every original claim. As such, these initial comments were directed, *inter alia*, at both claim 8, which expressly contained a limitation requiring transformability by the user, and claims 1 and 4, which contain no such limitation. The Court therefore finds that Garth's remarks regarding "foldability" are "of little significance" in interpreting claims 1 and 4 and should not be read into those claims. *United States v. Telectronics, Inc.*, 857 F.2d 778, 783 (Fed.Cir. 1988), *cert. denied* 490 U.S. 1046, 109 S.Ct. 1954, 104 L.Ed.2d 423 (1989).

Following Garth's amendment, the examiner held a telephone interview with Strauss and allowed the claims in full subject to an examiner's amendment, which made identical modifications to both claim 1 and claim 4, noted below in underlined text as they affected claim 1:

1. A cervical collar formed of a stiff, flexible flat plastic sheet band *having an asymmetrical configuration* comprising:

(a) an elongated neck encircling band formed of said stiff, flexible sheet material having front, side and back portions;

(b) a chin support brace, also formed *entirely* of stiff flexible plastic sheet material having a generally c-shape *including fastening means located on each end of said brace;*

(c) *said* chin support brace fastening means [distally] *being* engageable with *cooperative attachment means located at least* on opposite sides of said neck encircling band *such that* when said band is formed into said collar [to secure said brace into] *at least one of said fastening means is allowed to align with a respective attachment means thus bowing said brace thereby enabling said brace to obtain* an upwardly inclined, conically convex chin rest supported along its entire length by the upper edge of the front portion of said band and projecting forwardly therefrom; and

(d) collar retention means carried at each end of said band and mutually cooperative to retain said band in its collar configuration.

[*See* PX 521 at 40–41].

The examiner's amendment adds no language specifically requiring that the invention be transformed by a user. The examiner could have specifically inserted such a limitation. He chose not to do so.

The notion that arguments made during the prosecution do not necessarily limit a given claim is not a novel one. In *United States v. Telectronics*, 857 F.2d 778 (Fed.Cir. 1988), the Federal Circuit found that the district court mistakenly relied upon certain arguments made during the prosecution history and as a result improperly read a unjustified limitation into a claim.[10] This aspect of the *Telectronics* decision is applicable to the case *sub judice.* The claims as submitted by Garth contained a claim 8 which had a transformability limitation and a claim 1 which did not. Thus, the Court finds that general transformability arguments made by Garth which were not specifically directed to claim 1 are "of little significance" in interpreting claim 1. *See also Intervet America, Inc. v. Kee–Vet Labs*, 887 F.2d 1050 (Fed.Cir. 1989). The Court concludes, therefore, that claims 1 and 4 of the '619 patent as issued did not contain a limitation requiring that the

---

**10.** In its briefing, Tecnol does not address the portion of the *Telectronics* opinion relied upon by CalMed. Rather Tecnol focuses a section of the Federal Circuit's analysis which occurs earlier on the same page as the portion CalMed relies upon, in which the Federal Circuit examined a different part of the prosecution history and held that arguments made regarding limitations which are removed prior to issuance of the claims are not to be used to limit the scope of the claims. This situation is not present in the case *sub judice.*

invention be transformable by the user from a two-dimensional to a three-dimensional configuration.

During the subsequent prosecution of the '219 reissue patent, Garth attempted to remove the phrase "when said band is formed into said collar" from claim 1. He did not attempt to remove this identical language from claim 4. Garth also attempted to amend dependent claim 8 so that it depended upon claim 1 rather than claim 4. [PX 522 at 17 [11]].

The patent examiner rejected all of the claims as presented by Garth in the reissue application, [PX 522 at 26]. In doing so, the examiner found that claims 1 and 4 were anticipated by a certain prior art reference because the limitation of paragraph (c) did not structurally define the invention over the prior art. [PX 522 at 27]. Following this rejection, Garth once again amended the claims, with one of the changes being the reinsertion of the phrase "when said band is formed into said collar" into claim 1. Tecnol seizes upon this chain of events as proof that paragraph (c) required transformability by the user, but the Court is unpersuaded. The prior art reference that was relied upon by the examiner in initially rejecting claims 1 and 4 had not been cited during the prosecution of the '619 parent patent, and the examiner cited the reference to strike not only the amended claim 1 but the unamended claim 4, which still contained the phrase "when said band was formed into said collar." This particular portion of the reissue prosecution history does not change the Court's previous conclusions.

Thus, the Court concludes, for the reasons stated above, that the plain language of the claims, the specification, and the prosecution history all support a finding that claims 1 and 4 are not limited to a cervical collar which is capable of being transformed by the user from a substantially two-dimensional storage configuration to a three-dimensional cervical collar formation. Accordingly, the fact that the 911 collar cannot be transformed from a two-dimensional configuration to a three-dimensional configuration does not support

Tecnol's contention that the 911 collar does not literally infringe the '219 patent.

#### b. *Disputes Relating to the Band*

■ Paragraph (a) of claim 1 claims "an elongated neck encircling band formed entirely of stiff, flexible plastic sheet material having front, side and opposite side portions." Two disputed issues of claim construction exist with respect to the band claimed in Claim 1: 1) whether Claim 1 is limited to a band that completely encircles the patient's neck or whether it also covers a band that only partially extends around a patient's neck, and 2) whether Claim 1 is limited to a one-piece band.

#### 1) "Neck Encircling"

In claim 1 of the parent '619 patent, Garth claimed "an elongated neck encircling band ... having front, side and back portions." In his reissue application, Garth attempted to claim simply "an elongated neck encircling band." [PX 522 at 13]. Eventually, after several rejections and amendments, Garth and the examiner settled upon "an elongated neck encircling band ... having front, side and opposite side portions." Garth testified at trial that this change in claim language was motivated by Garth's belief that the patent should cover a cervical collar which had no back portion such as the NecLoc collar. The NecLoc collar was a two-piece collar which was sometimes promoted as being useable without the back portion. [Tr. 289:19–292:3].

Garth's trial testimony on this issue is precisely the sort of extrinsic evidence which the *Markman* decision found was not to be considered in construing patent claims. The relevant arguments are those made by Garth during the prosecution of the reissue application, not those made at trial. While Garth stated numerous times in the prosecution history that he sought to remove the limitation requiring that the band have a back portion, he never sought to alter or remove the limitation which required the band to encircle the neck. The Court finds that the plain and ordinary meaning of "neck encircling" is that the band must surround the

---

**11.** The '219 prosecution history has been pag- inated by counsel for ease of reference.

patient's neck so that it forms a circle around the patient's neck.

The front and back band sections of the 911 collar clearly encircle a patient's neck. CalMed also contends, however, that the front band section, acting in concert with a velcro strap, would also constitute a neck encircling band. The Court finds that the front band section alone does not "encircle" the neck within the meaning of the '219 patent, and for that reason a hypothetical Tecnol collar formed solely of the front band section and a Velcro strap would not be "neck encircling" unless the Velcro strap could be considered part of the "band". This issue is discussed below as part of the Court's discussion of the "entirely" limitation.

### 2) *Single Piece of Material*

Claim 1 of the '219 patent also requires that the "elongated neck encircling band" be "formed entirely of stiff, flexible, plastic sheet material." Tecnol contends that this language requires that the band be formed out of a single piece of material. Tecnol's argument proceeds in two stages. First, Tecnol contends that the term "band" taken alone describes a single piece of material. Second, Tecnol contends that even if the term "band" includes several pieces joined together, the additional limitation requiring that the band "be formed entirely of stiff, flexible, plastic sheet material" requires the band to be formed out of a single piece of material.

### a) *"Band"*

Tecnol contends that the term "band" defines a single continuous strip of material. [TAB at 20]. The Court finds that the ordinary meaning of "band" is not limited to a single unblemished and uninterrupted piece of material, but also encompasses two or more pieces of material which are joined together to encircle an object. Wristwatch bands, for example, are sometimes made from a single piece of metal, leather, or plastic, but they are also made from pieces of metal, leather, or plastic which are fastened together during manufacture. All are referred to as "bands."

Tecnol does not rely solely upon its understanding of the ordinary meaning of "band", but also argues that the specification of the '219 patent, specifically the portion entitled "Background of the Invention," provides a special definition of "band" that excludes two pieces that are joined together:

Cervical collars are commonly formed of relatively thick material, usually in two pieces which are assembled about a wearer's neck. These collars are too bulky and cumbersome for field use by paramedics. Some attempts have been made to provide cervical collars from stiff flexible sheet material which is cut into an elongated band that is encircled about the wearer's neck. Although rolled edges of leather or plastic foam have been provided on some of these collars as in U.S. Pat. No. 3,075,521 [Grassl], none of these cervical collars adequately provide support and restraint for the wearer's chin.

[PX 520, 1/12–23].

The Court finds that this portion of the specification does not support restricting "band" to exclude two pieces of material joined together. The specification contrasts collars which consist of two separate pieces which must be secured into position by the user (and are not described as "bands") with collars that do not have pieces (and are described as "bands"). A band consisting of two pieces that have been permanently attached during manufacture is not inconsistent with the description of a band contained in the specification, notwithstanding the fact that the specific example of a band disclosed in the specification, U.S. Pat. No. 3,075,521 [Grassl, DX 25], was formed from a single piece of material.

As discussed previously, the Court's construction of the term "band" is not dispositive of the single piece dispute because the Court must also construe the more crucial "formed entirely" limitation.

### b) *"Formed Entirely"*

Tecnol contends that the claim 1 language requiring that the band be "formed entirely of stiff flexible plastic sheet material" excludes any band which is formed of two pieces of stiff flexible plastic sheet material which are permanently attached, at least

where the attachment means does not also consist of stiff flexible plastic sheet material. [TAB at 21]. Tecnol relies upon the '219 patent prosecution history to support its interpretation of "entirely."

In his initial reissue application, Garth attempted to remove many of the band limitations from Claim 1 by claiming only "an elongated neck encircling band." [PX 522 at 13]. The patent examiner initially rejected claim 1, *inter alia*, as anticipated by Grassl:

> Grassl discloses a cervical collar having a neck encircling band (16), a chin support brace (15) with fastening means (24) and collar retention means (18, 17) located on each end of the brace. The limitation of (c) of the claim does not structurally define over the same as disclosed by Grassl.

[PX 522 at 27].

In response, Garth submitted a new amendment putting some of the previously deleted band limitations back into claim 1:

> (a) a collar formed of an elongated neck encircling band formed entirely of stiff, flexible plastic sheet material;

[PX 522 at 31]. This amended language does more, however, than simply restore some of the previous limitations. Garth added strict language requiring that the band be formed *entirely* of the requisite material. In his remarks, Garth specifically distinguished claim 1 over Grassl:

> The Grassl collar bears no apparent relationship to applicant's collar, and the rejection under 35 USC 102 is thus made on the basis that the rejected claims do not *exclude* the Grassl collar. Claim 1, however, includes the following recitations which are not present in the Grassl collar:
> (1) "formed entirely of" (lines 1, 5 and 7);
> (2) " "conically convex chin rest" (line 16); and
> (3) "having a generally C–shape" (lines 8 and 9).
> Perhaps the most apparently distinguishing of the aforementioned recitations are those which limit the band and the chin support brace of the collar to being formed entirely of stiff, flexible plastic sheet material. This clearly is not present in Grassl, as the tubular elements of formed of soft material which is padded with foam rubber. The foam rubber in Grassl tubular elements 13 and 14 is necessary not simply for comfort of the patient, but is necessary for structural shape and support of the soft material. in contrast, applicant's claims cover a collar in which the structural elements are formed entirely of the recited stiff, plastic sheet material, but in which nonstructural padding such as foam strip 21 can be optionally included.

[PX 522 at 34–35 (text uncorrected)]. Through these remarks, Garth emphasized the importance of the "entirely" limitation. Following this explanation, the examiner rejected claim 1 as indefinite, but found that providing some wording changes were made, which are not important to the present issue, "the claims appear to be allowable over the art of record," and further stated "Applicant's arguments regarding the claimed limitations of Claim 1 are persuasive." [*Id.* at 41].

In the portion of the prosecution history quoted above, Garth argued that the "claims cover a collar in which the structural elements are formed entirely of the recited stiff, plastic sheet material." Tecnol contends that whatever means are used to connect the pieces of a multiple-piece band constitute "structural elements," and therefore the claims require that any such fastening must also be formed entirely of stiff, flexible plastic sheet material.

In response, CalMed makes two arguments.

First, CalMed contends that a band that is made entirely out of one piece of material does not cease being made "entirely" out of that material if the band is cut into two pieces and the two pieces are then reattached. At trial, CalMed demonstrated its point using the clear piece of stiff flexible sheet material found in the collar of a man's shirt when it is first removed from its packaging. [PX 565]. All parties agreed that this material, when formed into a band, was made "entirely" from flexible sheet material. All parties agreed that this band was still made "entirely" from flexible sheet material if a sticker was placed upon the band, or if a

metal staple was put through the band. The parties disagreed on how to describe the band, however, once counsel for CalMed cut the band in half and then reattached the two pieces with a metal staple. Tecnol's expert, Preston, opined that the band was then no longer formed entirely out of stiff flexible sheet material because "now you are lending structure" with the metal staple. [Preston Tr. at 1870].

The Court finds that Tecnol's construction of the "entirely" limitation is correct. Taken in its ordinary meaning, "entirely" implies that all pieces of the band are to be formed out of stiff, flexible plastic sheet material. Garth's comments during the prosecution of the reissue application clarify and do not alter this basic understanding of "entirely." Garth stated that the band's "structural elements" must be formed entirely out of the requisite material, as opposed to "nonstructural" elements such as foam padding provided for comfort, which do not. [PX 522 at 35]. The claims require, therefore, that any element of an accused band which is properly described as a "structural element" must be formed entirely out of stiff, flexible plastic sheet material.

Turning to the accused products, the Court finds that the sizing post and additional Velcro attachment means found in the 911 collar, are "structural elements." They perform a vital role in providing the 911 band with form and structure. They are not "nonstructural" or superfluous to the function of providing support, such as foam padding provided for comfort. Accordingly, the Court finds that this element of claim 1 is not found in the accused product, and this finding provides an additional basis for the Court's determination that the 911 collar does not literally infringe claim 1.

CalMed contends that this construction of the term "entirely" renders the claims internally inconsistent, because:

> Subparagraph (d) of Claim 1 expressly calls for "collar retention means carried at each end of said band ..." which, in the case of the Stifneck and the Tecnol collars, describes the Velcro–like fasteners riveted to the stiff flexible plastic neck encircling bands. Thus the claim clearly does not

require the absence of rivets as urged by Tecnol.

[CMOB at 11–12 (footnote omitted)]. The Court will assume *arguendo* that subparagraph (d) of Claim 1 claims retention means that are not formed of stiff, flexible plastic sheet material, and will further assume that these retention means are to be attached to the band with rivets which are also not formed of stiff, flexible plastic sheet material. The retention means, however, are not a subcomponent of the band. Subparagraph (a) discloses a band, which must be formed entirely of the requisite material. Subparagraph (d) claims separate components, retention means, which interrelate with the band and each other in a manner which allows the band to obtain and maintain a collar configuration. There is no inconsistency between the Court's determination that element(s) forming the band, be they one or several, must be formed entirely of the requisite material and the fact that a different component, which is not an element of the band, is not subject to such a limitation.

For the same reasons, the hypothetical Tecnol band formed solely out of the front band section and a Velcro strap would not literally infringe claim 1 because the Velcro strap is not "formed entirely of stiff, flexible plastic sheet material."

### c. *The Chin Support Brace*

1) *"Having a generally C–shape including fastening means located on each end of said brace"*

Tecnol contends that the limitation "generally C–shaped" is a two-dimensional term, and for this reason claim 1 excludes collars which are not transformable from a two-dimensional to a three-dimensional configuration by the user. For all the reasons previously stated by the Court during its discussion of transformability, *supra*, the Court declines to adopt Tecnol's claim construction. The "generally C–shaped" limitation provides the shape of the chin support brace necessary to obtain the structural relationship between brace and band. Garth testified that the 911 collar's chin support brace was generally C–shaped. The Court finds this testimony to be credible and adopts it.

The modified 911 chin support brace, on the other hand, achieves its shape through a thermoforming process during manufacture. The Court finds that this modified chin support brace simply does not have a "generally C–shape." For this reason, the modified 911 collar does not literally infringe claim 1. In addition, the modified 911 collar does not literally infringe claim 1 because the chin support brace fastening means are not located at each end of the brace, but rather are located in the center of the brace.

2) *"Supported along its entire length by the upper edge of the front portion of said band"*

 Tecnol contends that "[t]he plain meaning of 'along its entire length' is that the chin brace must be in contact, from one end to the other, with the upper edge of the front portion of the band." [TAB at 23]. Tecnol contends that this claim language excludes collars which exhibit any gaps between the chin support brace and the neck encircling band. The Court rejects this construction, and notes with approval the following persuasive commentary by our fellow court in the District of Rhode Island, which has had occasion to construe this aspect of the '219 patent:

"[S]upported upon its entire length" does not mandate constant contact. "Support" does not mean the same thing as "constant contact." Therefore, an item made out of an inherently stiff material, such as the hard plastic from which these collars are made, is "supported along its entire length" without constant contact, and the presence of gaps does not alter that support. Thus, constant contact is not called for by the patent claims.

*California Medical Products, Inc. v. Emergency Medical Products, Inc.,* 796 F.Supp. 640, 644 (D.R.I.1992), *aff'd* 991 F.2d 808 (Fed.Cir.1993).

The Court finds that this element describes the support provided to the chin brace by the front portion of the band when the chin support is "loaded," that is, when it is performing its intended function of supporting a patient's chin. The Court further finds that the 911 chin support brace does meet this limitation when the chin support brace is loaded. The 911 chin support brace is supported along its entire length and as a separate matter it derives its entire support from the top front edge of the band.

During its rebuttal case, CalMed had Garth perform an experiment with an altered 911 collar to bolster its contention that the 911 chin support brace derived its support from the upper edge of the front portion of the band. Prior to taking the stand, Garth obtained a 911 collar and replaced the chin support brace's permanent fasteners with homemade removable fasteners. When Garth applied this experimental collar to himself and removed the fastening means from the chin support brace the chin support brace remained in place. CalMed offers this experiment as evidence that it is the front edge of the band and not the fastening means which provide support in the 911 collar.

Tecnol objected to this experiment on the grounds that it was not a proper rebuttal experiment and should have been previously disclosed to Tecnol. The Court reserved ruling on Tecnol's objection. The Court now finds that Tecnol's objection is moot because even without this demonstration, the remaining record in this case supports the Court's finding that the 911 collar is "supported along its entire length by the front edge of [the neck encircling] band" as that language has been construed by the Court.

#### d. Claim 1—Summary

In conclusion, the Court finds that the 911 collar does not literally infringe Claim 1 because the 911 collar's multi-piece band is not "formed entirely of stiff, flexible plastic sheet material" as required by subparagraph (b) of claim 1. The Court finds the modified 911 collar does not literally infringe claim 1 for the additional reason that the modified 911 chin support brace does not have a "generally C–shape" and does not have fastening means "located on each end" of the chin support brace.

#### 2. Dependent Claim 2

Claim 2 depends from Claim 1 and further claims:

the cervical collar of claim 1 wherein said neck encircling band has front, side and back portions and said front portion of said band is laterally offset from, and of greater width than, said side portions with curvilinear edges with smooth transition therebetween.

Because Claim 2 depends from claim 1, the 911 collar does not literally infringe Claim 2 for the reasons stated above for Claim 1. *Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1552 n. 9 (Fed.Cir.1989). In addition, the Court found the testimony of Tecnol's expert, Theodore B. Eyrick, regarding whether the additional limitations of Claim 2 are found in the 911 collar, to be more credible than Garth's testimony. Thus, the Court finds that, even assuming *arguendo* that the 911 collar literally infringed claim 1, the 911 collar still would not literally infringe claim 2.

### 3. Dependent Claim 6

Claim 6 depends from Claim 1 and further claims:

The cervical collar of claim 1 wherein said band of attachment fabric is engageable by a cooperative attachment fabric carried on the outside surface of one side portion of said encircling band.

Tecnol does not dispute that the 911 collar does in fact contain the additional elements disclosed in Claim 6. Because Claim 2 is dependent from claim 1, however, the 911 collar does not literally infringe Claim 2 for the reasons stated above for Claim 1.

### 4. Dependent Claim 7

Claim 7 depends from claim 1 and further claims:

The cervical collar of claim 1 wherein the bight portion of said chin support brace is of greater width than the remainder of said brace.

Using a pen to measure the width of the bight[12] portion of the chin support brace, Garth glided the pen up and down the 911 collar's chin support brace and estimated

that all other points on the chin support brace were about ⅛th of an inch narrower. [Tr. at 387:5–12]. Using a digital caliper, Eyrick measured the 911 chin support brace and determined that the bight portion was actually slightly narrower than the side portions. [Tr. at 1931–32, 1997].

Having observed these measurements as they were performed by the witnesses, the Court finds that Eyrick's measurements were more precise and credible. The bight portion of the 911 chin support brace is not of greater width than the remaining portions and therefore the 911 collar does not literally infringe claim 7. In addition, because Claim 7 is dependent from claim 1, the 911 collar does not literally infringe Claim 7 for the reasons stated above for Claim 1.

### 5. Dependent Claim 9

Claim 9 depends from claim 1 and further claims:

The cervical collar of claim 1 including a resilient band secured along and projecting slightly over the lower edge of said elongated band.

Tecnol's sole contention with respect to claim 9 is that "[f]or the same reasons that the 911 does not include an elongated neck encircling band as claim 1 requires, it also does not include the resilient band that claim 9 describes." The Court has previously found that the 911 has an elongated neck encircling band.[13] Thus, the Court finds that the additional limitation of claim 9 is found in the 911 collar. However, because Claim 9 is dependent from claim 1, the 911 collar does not literally infringe Claim 9 for the reasons stated above for Claim 1.

### 6. Dependent Claim 10

Claim 10 depends from claim 1 and further claims:

The cervical collar of claim 1 including an integral tab centrally dependent from the upper edge of said front portion of said band and permanently attached to the cen-

---

12. The parties agree that "bight" means "center" or "middle."

13. The Court's additional determination that band is not formed entirely out of stiff, flexible plastic sheet material is not relevant to the additional limitation claimed in claim 9.

tral undersurface of said chin support brace.

Tecnol does not dispute that the additional limitation claimed in claim 10 is present in the 911 collar. However, because Claim 10 is dependent from claim 1, the 911 collar does not literally infringe Claim 10 for the reasons stated above for Claim 1.

The modified 911 collar does not have the tab claimed in Claim 10.

### 7. *Independent Claim 4*

Claim 4 contains different language regarding the composition and structure of the neck encircling band:

> 4. A cervical collar formed of a stiff, flexible plastic sheet band having an *asymmetrical* configuration comprising:
>
> (a) an elongated neck encircling band formed of stiff, flexible sheet material having a front, side and back portions with said back portion *integral* with one of said side portions. . . .

[PX 520 at 4/51–57 (emphasis added)].

The parties dispute the proper construction of the terms "asymmetrical" and "integral."

#### a. *"Asymmetrical"*

■ Tecnol's principal argument with respect to the "asymmetrical" limitation is that asymmetry is a term which is only applicable to a two-dimensional figure or structure. [TAB at 25]. This proposed construction is relevant because it ties in with Tecnol's arguments, previously rejected by the Court, that the invention is limited to a collar which must be transformable by a user from a two-dimensional to a three-dimensional configuration. The specification makes clear, however, that Garth used the word "asymmetrical" to describe a collar that fastened at the side as opposed to the back of a patient's neck. [PX 520 at 2/28–32; 3/61–65]. The parties do not dispute that the 911 collar closes at the side, therefore, the 911 collar is "asymmetrical."

#### b. *"Integral"*

■ Tecnol contends that the limitation of Claim 4 which requires the back portion to

be "integral" with the side portion excludes multi-piece collars in which the pieces are permanently attached together. To support this construction, Tecnol relies upon the following dictionary definition:

> [F]ormed as a unit with another part (as the main part)—often used with: used esp. of a part of a tool or mechanism < the pin is [integral] with the pump body—H.F. Blanchard & Ralph Ritchen> <heat transfer through tubes with [integral] spiral fins—*Transactions of Amer. Society of Mech Engineers*> <the steam chest may be an [integral] part of the turbine casing or may be bolted to it—B.G.A. Skrotzki & W.A. Vopat>.

[DX 59].

Tecnol submits that a person of ordinary skill in the art would draw a distinction between "integral" and "permanently attached." Eyrick opined that items that were casted or molded together would be two examples of items that were "integral." [Eyrick Tr. at 1918]. Tecnol also relies upon the language of dependent claim 10 to support its desired distinction:

> 10. The cervical collar of claim 1 including an integral tab centrally dependent from the upper edge of said front portion of said band and permanently attached to the central undersurface of said chin support brace.

[PX 520 at 6/17–21]. Tecnol contends that this claim language demonstrates that Garth was aware of the difference between "integral" and "permanently attached" and thus claim 4 does not cover permanently attached multi-piece bands.

The Court finds that the ordinary meaning of "integral" may encompass items which are permanently attached. Prior art in the same field as the '219 patent uses the term "integral" in such a fashion. [U.S. Patent No. 3,530,853, DX 0031 at 3/56–57 ("A downwardly extending apron is integrally connected or situated with the neck encircling portion. . . .")]. Moreover, Courts have ruled that the term "integral" may encompass permanent attachment. *Advanced Cardiovascular Systems, Inc. v. Scimed Life Systems,*

*Inc.,* 887 F.2d 1070, 1072 (Fed.Cir.1989); [14] *In re Hotte,* 475 F.2d 644, 647 (CCPA 1973) (" '[I]ntegral' is sufficiently broad to embrace constructions united by such means as fastening and welding.").

The Court does not find that "integral" *cannot* mean "permanently attached," but does find that as used in the '219 patent "integral" *does not* mean "permanently attached." In the initial '619 patent application, claim 4 depended from claim 1. Subparagraph (a) of claim 1 claimed "an elongated neck encircling band formed of stiff, flexible sheet material having a front side and back portions." [PX 521 at 14]. Claim 4 further claimed "[t]he cervical collar of claim 1 wherein said back portion is integral with one of said side portions." [*Id.*]. The sole difference between claims 1 and 4 was the addition of the "integral" limitation. Garth explained this difference in the specification:

> In its preferred embodiment, the elongated band is asymmetric about its lateral axis 23 with the back portion 18 of band *being integral* with one side portion 14. . . .

[PX 521 at 9 (emphasis added)]. The portions of the patent drawings referred to by number in the specification indicate that "being integral" meant "one piece."

By looking to the specification to explain the meaning of "integral" as used in Claim 4, the Court is not impermissibly reading limitations from the specification into the claim 4, but rather, is using the specification to confirm that Garth used "integral" to mean "one piece," which is the only logical definition possible *for this patent.* "One piece" is the only logical definition because it is the only definition which would make Garth's original

dependent claim 4 narrower than Garth's original claim 1. Garth's original claim 1 did not specify how the front side and back portions were connected. The subsequently added "entirely" limitation was not present. Garth's original claim 1, therefore, would have covered a multi-piece band. Claim 4 was intended to be narrower than Claim 1 in that it excluded the possibility of attachment of multiple pieces and focused on one-piece design, which was the subject of Garth's preferred embodiment.

Claim 4 would later be amended and rewritten as an independent claim, and at that time the "asymmetrical" limitation would be added, but the meaning of "integral" would receive no further explanation. The only further usage of "integral" would occur with the addition of Claim 10, in which Garth would once again draw a distinction between "integral" and "permanently attached." [15]

As discussed previously, Garth would later put a similar one-piece limitation in claim 1 by adding the "formed entirely" limitation during the '219 reissue patent prosecution. The "formed entirely" limitation of claim 1 and the "integral" limitation of claim 4 have the similar effect of limiting both claims to collars with one-piece bands. Claims 1 and claim 4 are not identical in scope, however, because the presence of the "asymmetrical" or side closure limitation in claim 4 differentiates it from claim 1.

Accordingly, the Court finds that the permanently attached front and back band sections of the 911 collar do not form "an elongated neck encircling band having a front, side and back portions . . . with said back portion integral with said side portion," and

---

14. In *Scimed* the Federal Circuit reversed the district court, which had granted summary judgment in favor of the alleged infringer upon construing the term "integral" to mean one piece. The Federal Circuit found that a genuine dispute of fact did exist with respect to the meaning of the term integral. Claim construction is a matter of law and the Federal Circuit reviews claim construction determinations *de novo.* The Court does not rely upon *Scimed* for the proposition that the meaning of "integral" as it is used in the '219 patent involves factual disputes, nor does it understand *Scimed* to hold that "integral" always includes "permanently fastened" as a

matter of law regardless of the claims, specification, and prosecution history of the specific patent-in-suit. Rather, the Court relies upon *Scimed* for the proposition that the ordinary meaning of "integral" may include "permanently fastened."

15. Claim 10 claims:

> The cervical collar of claim 1 including an integral tab centrally dependent from the upper edge of said front portion of said band and permanently attached to the central undersurface of said chin support brace.

[PX 520 at 6:17–21].

for this reason finds that the 911 collar does not literally infringe Claim 4.[16]

### 8. Conclusion—Literal Infringement

 In conclusion, the 911 and modified 911 collars do not literally infringe claim 1 of '219 patent because the neck encircling bands are not "formed entirely out of stiff, flexible plastic sheet material."

The 911 and modified 911 collars do not literally infringe claim 4 of the '219 patent because the neck encircling bands do not have a "back portion integral with one of said side portions."

The modified 911 collar does not literally infringe claims 1 and 4 for the additional reasons that the modified 911 chin support brace is not "generally C–shaped" and does not have "fastening means located on each end of said brace."

Claims 2, 6, 7, 9, and 10 all depend from claim 1. The 911 and modified 911 collars do not literally infringe these dependent claims for the same reasons they do not literally infringe claim 1. In addition, the 911 and modified 911 collars do not literally infringe dependent claims 2 and 7 because the additional elements of those claims are not found in the 911 or modified 911 collars. The modified 911 collar also does not literally infringe dependent claim 10 because the additional element of claim 10 is not found in the modified 911 collar.

The Court has construed the disputed claims as a matter of law in accordance with the *Markman* decision. *Markman v. Westview Instruments*, 52 F.3d 967 (Fed.Cir), *cert. granted,* —— U.S. ——, 116 S.Ct. 40, 132 L.Ed.2d 921 (1995). In doing so the Court has not relied upon credibility determinations to justify those instances where the Court's claim construction has been at odds with one or more of the experts. The Supreme Court has granted certiorari in *Markman.* If the Supreme Court were to reverse the Federal Circuit, claim construction might once again involve underlying factual disputes. Such an

eventuality would not alter this Memorandum Opinion because the Court's claim construction in the case *sub judice* would not change if the Court were to be allowed to rely upon the experts' testimony to support the Court's various analyses.

### C. Doctrine of Equivalents

#### 1. Legal Standard

 Under the doctrine of equivalents, an accused device may still infringe even if literal infringement does not exist. After post-trial briefing was complete, the Federal Circuit sitting *en banc* restated and clarified the doctrine of equivalents. *Hilton Davis Chemical Co. v. Warner–Jenkinson Co., Inc.,* 62 F.3d 1512 (Fed.Cir.1995). The Federal Circuit explained that the doctrine of equivalents exists because:

> limiting enforcement of exclusive patent rights to literal infringement "would place the inventor at the mercy of verbalism and would be subordinating substance to form" [and] might even encourage infringers "to make unimportant and insubstantial changes and substitutions in the patent which, although adding nothing, would be enough ... [to evade] the reach of law."

*Id.* at 1517 (citing *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 607, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950)).

 Infringement under the doctrine of equivalents is a question of fact. *Id.* at 1520. The doctrine is equitable only in the sense that it "prevents the unfairness of depriving the patent owner of effective protection of its invention, thereby achieving a fair or 'equitable' result." *Id.* at 1521 (citations omitted). Because the doctrine is not strictly speaking an equitable doctrine a trial judge does not have discretion to choose whether to apply the doctrine of equivalents and any plaintiff may invoke the doctrine where no literal infringement exists. *Id.* at 1521–1522.

 Infringement may be found under the doctrine of equivalents if the differences between the claimed and accused

---

**16.** Likewise, the hypothetical Tecnol band formed solely out of the front band section and a Velcro strap would not literally infringe claim 1 because the Velcro strap back portion would not be formed of "stiff, flexible sheet material" and would not be "integral" with the front band section.

products are insubstantial. *Id.* at 1517. Substantially of differences is determined according to an objective standard, and is assessed from "the vantage point of one of ordinary skill in the relevant art."[17] *Id.* at 1519. Substantiality is most often measured by the function-way-result, or triple identity test, under which infringement exists if the accused product performs substantially the same function in substantially the same way to produce substantially the same result. *Graver Tank,* 339 U.S. at 608, 70 S.Ct. at 856. Each individual element or limitation of a claim, or its equivalent, must be found in the accused product. *Pennwalt Corp. v. Durand–Wayland, Inc.,* 833 F.2d 931, 934–35 (Fed.Cir.1987), *cert. denied,* 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988); *Lemelson v. United States,* 752 F.2d 1538, 1551 (Fed.Cir.1985).

■ The function-way-result test is not "the test" for determining equivalency and the evaluation of function, way and result does not necessarily end the Court's inquiry. *Hilton Davis,* 62 F.3d at 1518. Other factors such as evidence of copying, which suggests that differences between the claimed and accused products are insubstantial, or evidence of "designing around" the claims, which suggests that differences between the claimed and accused products are substantial, may also play a role in the Court's analysis. *Id.* at 1520.

■ Finally, the doctrine of equivalents may not be utilized to expand the scope of a claim to the point that prior art would invalidate it, *Wilson Sporting Goods Co. v. David Geoffrey & Assocs.,* 904 F.2d 677, 685 (Fed. Cir.), *cert. denied* 498 U.S. 992, 111 S.Ct. 537, 112 L.Ed.2d 547 (1990), or to "allow the patentee to recapture through equivalence certain coverage given up during prosecution." *Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d 861 (Fed.Cir.1985).

CalMed presented two principal witnesses who testified regarding the doctrine of equiv-

alents, Dr. Joseph L. Ryan and Garth. Tecnol also presented two principal witnesses, Eyrick and Albert W. Preston, Jr., as well as Vernon Stevenson, who testified only through designated deposition testimony. As a threshold matter, the Court must determine to what extent the Court may rely upon Ryan's testimony. During the trial Tecnol objected to Ryan's testimony regarding whether certain collars, including the accused collars, were "Stifneck-like." Ryan conceded that he did not thoroughly read the '219 patent and had not formed an opinion regarding whether the Tecnol collars infringed the '219 patent. [Ryan Tr. at 119]. The Court ruled that Ryan was not testifying as a patent expert and was not rendering an opinion on infringement questions. The Court further found, however, that Ryan did have medical expertise and could describe the physical attributes of various collars and the functions of each, and that how Ryan's testimony could be utilized for the doctrine of equivalents would depend upon the testimony. [Tr. at 120].

Ryan's testimony regarding the Tecnol collars involved comparisons of the accused products with the Stifneck collar, not with the claims of the '219 patent. *Sun Hill Indus., Inc. v. Easter Unlimited, Inc.,* 48 F.3d 1193, 1196 (Fed.Cir.1995) (holding that trial court erred and committed legal error by relying on features such as color, size, and material which were found in commercial embodiment but not claimed in patent); *Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d 861, 870 (Fed.Cir.1985). CalMed states that "Dr. Ryan used the Stifneck collar as an example to explain the function, way and result of the Garth invention." Such an approach creates a danger that an equivalents determination will "rely on unclaimed and therefore irrelevant features as grounds for similarity or difference." *Sun Hill,* 48 F.3d at 1196. "The trial court must measure infringement against the claim, not against a commercial embodiment that contains more than the

17. The level of ordinary skill as defined by Eyrick, [Tr. at 1898], and not disputed by CalMed, [Tr. at 2216], is a person having:

[T]echnical education or training preferably in mechanical engineering or biomedical engineering or the equivalent, with some knowl-

edge and experience in emergency care, advanced cardiac life support, paramedic skills or anatomy, ... and some training and experience in the strength and design characteristics of materials. And also experience with the manufacture of medical or biomedical devices.

claim." *Id.* at 1197. This Court may utilize Ryan's testimony but only to the extent that comparisons between the Stifneck and the Tecnol collars are confined to features which are found in the Stifneck collar *and* claimed in the '219 patent. *Id.* The Court must be especially diligent in performing this task because Ryan clearly did not base his opinions on a reading of the claims of the '219 patent.

The Stifneck collar has three additional features beyond that which is claimed in claims 1 and 4. First, one of the chin piece fastening means is detachable, allowing the Stifneck to be transformed from a two dimensional to a three dimensional configuration.[18] Second, the Stifneck has a resilient band secured along and projecting below the neck encircling band, a feature which is present in dependent claim 9 but not in independent claims 1 or 4. Third, the Stifneck has a "trach hole" in the front of the neck encircling band, which is a feature which is not claimed in any of the claims of the '219 patent. With these differences in mind, the Court can keep Dr. Ryan's testimony in the proper context.

### 2. *Discussion*
#### a. *Triple Identity Test*

■ The Court has determined that the 911 band does not literally infringe claims 1 and 4 because the band is not "formed entirely out of stiff, flexible plastic material" within the meaning of claim 1, and does not have a "back portion integral with one of said side portions" within the meaning of claim 4. With respect to both claims it was the presence of the sizing post which took the 911 collar outside the literal scope of the claims. Thus, in order for the Court to find infringement under the doctrine of equivalents, CalMed must prove that this difference is insubstantial when viewed in the context of the invention as a whole. *Perkin–Elmer Corp. v. Westinghouse Elec. Corp.,* 822 F.2d 1528, 1532–33 (Fed.Cir.1987). Viewing the differences "in the context of the invention as a whole" is not an invitation to treat the limitations placed upon the band in claims 1 and 4 as insignificant or immaterial, however,

because CalMed must prove the presence of every element or its equivalent in the accused collars. *Id.* at 1533 (quoting *Lemelson v. United States,* 752 F.2d 1538, 1551 (Fed. Cir.1985).

Ryan and Garth both testified that the function of both the claimed invention and the 911 collar was to provide neutral alignment of the spine of an injured person and restrict that person's movement. [Ryan Tr. at 131:21–133:22, 135:14–136:20; Garth Tr. at 391:14–19; 393:13–19, 398:15–399:2]. Thus, the result that is achieved is that the patient's spine is maintained in a neutral alignment, decreasing the risk of further injury. Tecnol does not dispute that this was part of the function of the claimed invention, but contends that transformability is also an important function of the claimed invention. Because the Court has previously found that transformability is not a limitation of claims 1 and 4, the Court rejects this argument.

The critical dispute revolves around the way in which this support function is performed in the claimed invention and by the 911 collar. Ryan testified that the way in which both the claimed invention and the 911 collar performed their function was the same. The collars encircle the patient's neck, without constricting it, and provide points of contact or stabilization over the sternum, over the trapezius, and to the mandible. In the front of the collar, the chin brace is supported by the upper edge of the band and restricts flexion motion in a patient by way of counteracting forces along the line from the chin to the sternum. [Ryan Tr. at 66:17–20, 134:9–13, 134:17–135:1]. At the back of the patient's head, the band provides support between the occiput of the skull and the posterior trapezia. [Ryan Tr. at 134:4–6, 21–23, 136:12–16]. The way in which the collar limits lateral movement and rotation is by fastening of the chin support brace to opposite sides of the neck encircling band, with the bowed chin brace supported by the upper edge of the neck encircling band. [Ryan Tr. at 134:13–16, 135:2–5, 136:16–20].

Garth testified that the way in which bands of the claimed invention and the 911 collar

---

**18.** This feature is present in Claim 8, which is not at issue in this case.

achieve their function is that the collars resist the forces of a patient's chin by fastening the chin support brace to opposite sides of the encircling band. The band is formed out of stiff, flexible sheet material and sufficient curvature exists in the sheet material to support the chin support brace as downward force is exerted against the brace by the patient's chin. [Garth Tr. at 524:25–527:3].

This testimony addresses the broad nature of the invention, but it fails to address whether the sizing post, which allows the band to be adjusted on both sides, is a substantial or insubstantial difference. Ryan did acknowledge the presence of this differentiating feature in his testimony:

> [The 911 collar] is functionally a one piece collar. The two portions of the—the anterior and posterior portions of the collar are fixed together by an adjustable rivet and they are fixed in place overlying that rivet by a Velcro attachment that makes the right side of the collar fast and essentially one piece.

[Ryan Tr. at 132:2–8].

> The [911] collar has on its left side, as I said, a rivet which attaches the anterior and posterior portions of the collar together, and that is slidable to adjust the total circumference of the collar and provide some adjustment. And that, as I said, is functionally in a fixed position, with the application of the Velcro overlying the rivet.

[Ryan Tr. at 133:5–11].

This testimony characterizes the sizing post as "fixed," as indeed it is when the overlying Velcro strap is fastened. Ryan fails to address, however, the significance of the fact that the Velcro may be unfastened to allow the band to be adjusted on both sides. Paul N. Brost, the President of Tecnol's Orthopedics Division, testified that the adjustability of the Tecnol band via movement of the sizing post allows the 911 to achieve a better fit on the patient. [Brost Tr. at 1411:4–1416:11]. Specifically, Brost testified:

> The adjustment of the final sizing slot . . . causes the gap to go away between the

patient's head and the actual collar when that last inch to inch and a half of sizing is achieved.

> Now, an inch to an inch and a half may not sound like a lot, but when you think about how much an inch to an inch and a half means in the collar size of a shirt, it's quite a significant amount.

[Brost Tr. at 1415:23–1416:5].[19]

The Court finds that Brost's testimony, which the Court finds to be credible, supports a finding that the presence of the sizing post is a substantial difference between the 911 collar and the claimed invention. [See also Designated Stevenson Deposition testimony at 53]. In reviewing the testimony and the post-trial briefing to determine what arguments CalMed has made in refutation of this testimony, the Court finds three arguments meriting specific mention.

First, CalMed contends that "severing the back portion of one long neck encircling band made from one seamless portion of material and reattaching it is not a substantial change, if any change at all." [CMOB at 25 n. 15]. This argument is unpersuasive because it mischaracterizes the nature of the sizing post. The sizing post is not merely a staple that fixes two pieces together. The sizing post and sizing slot allow the fit of the 911 collar to be adjusted on both sides.

Second, CalMed contends that the 911 collar is equivalent to the claimed collar because Tecnol marketing literature describes the 911 collar as "one-piece." The proper inquiry is not what marketing language Tecnol may or may not have used. The appropriate inquiry is whether the 911 collar falls within the language of the claims (literal infringement) or whether the difference is insubstantial (doctrine of equivalents).

Third, one aspect of the discussion of the improved fit provided by the 911 collar is whether the application of the Stifneck, which can only be adjusted on one side, imparted a potentially injurious "rotational torque" to a patient's neck that was not present in the 911 collar. [Brost Tr. at 1414]. Garth specifically disagreed with Tec-

---

**19.** In his designated deposition testimony, Brost further elaborated on the advantages in fit provided by the 911 collar's double-sided adjustability. [See 8/11/92 Brost Dep. Tr. at 89, 104–07].

nol's "rotational torque" contention. Even if the Court were to credit Garth's testimony over Brost's however, this would only refute the notion that the claimed invention may cause further injury during application. It would not refute the evidence put forth by Tecnol that the 911 collar has the capacity for a better fit once application is complete.

### b. "Copying" v. "Designing Around"

At trial, the parties' expert witnesses relied primarily upon a function-way-result analysis. In its reply brief, however, CalMed asserts that Tecnol copied the Stifneck collar. In support of this assertion CalMed relies upon designated deposition testimony of Vernon Stevenson, the Tecnol employee who was the principal designer of the 911 collar. Stevenson testified that he measured the various sizes of Stifneck collars, e.g., short and tall, and used this information to develop the sizing for the Tecnol collars. [10/21/92 Stevenson Dep. at 44:5–12 (portion relied upon by CalMed); *see also* 40–51 (designated portions only)]. The Court finds that such evidence of copying or tracing relating to the size of various components of the Stifneck, or relating to differences between the various sizes of Stifneck collars is of little significance to the question of equivalents, because these are all features of the commercial embodiment that are not part of the claimed invention. The '219 patent does not claim measurements or dimensions or even that different sizes of collars may be desirable. Upon consideration of all of the relevant testimony, the Court concludes that Tecnol was well aware of the characteristics of the claimed invention and made efforts to design around the claimed invention.

### c. *Prosecution History Estoppel*

 Tecnol contends that the doctrine of prosecution history estoppel precludes a finding that the 911 and modified 911 collars infringe claim 1 under the doctrine of equivalents.[20]

20. Tecnol does not contend that prosecution history estoppel is applicable to Claim 4.

21. *Andrew Corp. v. Gabriel Electronics, Inc.,* 847 F.2d 819 (Fed.Cir.), *cert. denied* 488 U.S. 927, 109 S.Ct. 312, 102 L.Ed.2d 330 (1988); *Hi–Life Products v. American Nat. Water–Mattress,* 842

Prosecution history estoppel limits infringement by otherwise equivalent structures, by barring recapture by the patentee of scope that was surrendered in order to obtain allowance of the claims. thus, by actions taken during patent prosecution the patentee can be estopped from reaching subject matter that otherwise meets the criteria of equivalency. *Pall Corp. v. Micron Separations, Inc.,* 66 F.3d 1211, 1218–19 (Fed.Cir.1995) (citations omitted). The relevant standard is an objective one "that depends on what a competitor reasonably would conclude from a patent's prosecution history." *Mark I Marketing Corp. v. R.R. Donnelley & Sons Co.,* 66 F.3d 285, 291 (Fed.Cir.1995). Whether prosecution history estoppel exists is a matter of law. *Id.*

 Garth added the "entirely" limitation to claim 1 in order to overcome a rejection based on prior art. [PX 522 at 34]. In doing so, Garth surrendered coverage over devices with bands with "structural elements" that were not made entirely out of stiff, flexible plastic sheet material. This is the classic case giving rise to prosecution estoppel. The addition of the "entirely" limitation gives rise to prosecution history estoppel even if in fact it was not strictly necessary to secure allowance over the prior art. *See Haynes Int'l Inc. v. Jessop Steel Co.,* 8 F.3d 1573, 1579 (Fed.Cir.1993), *op. clarified on reh'g in part,* 15 F.3d 1076 (Fed.Cir.1994); *Wang Lab., Inc. v. Toshiba Corp.,* 993 F.2d 858, 867 (Fed.Cir.1993).

CalMed contends that invocation of prosecution history estoppel is not appropriate where amendments are made "for the purposes of explanation and clarity." [CMCL 43]. The Court does not disagree with this statement as a matter of black letter law, but it is inapplicable to the case *sub judice,* because the "entirely" amendment was made to distinguish prior art, not merely to explain or clarify. The decisions[21] relied upon by CalMed are distinguishable on this basis.

F.2d 323 (Fed.Cir.1988); *Moeller v. Ionetics, Inc.,* 794 F.2d 653 (Fed.Cir.1986), *overruled by Markman v. Westview Instr.,* 52 F.3d 967 (Fed.Cir.), *cert. granted* —— U.S. ——, 116 S.Ct. 40, 132 L.Ed.2d 921 (1995); *Great Northern Corp. v.*

### 3. *Conclusion—Doctrine of Equivalents*

After careful consideration of all of the evidence and application of the function-way-result test, the Court finds that CalMed has failed to prove that the differences between the band of the 911 collar and the band of the claimed invention, when viewed in the context of the invention as a whole, are insubstantial. The Court finds that this determination is further supported by the Court's finding that Tecnol attempted to "design around" the claimed invention. Accordingly, the Court finds that the 911 collar does not infringe either claim 1 or claim 4 under the doctrine of equivalents. The Court further finds that the doctrine of prosecution history estoppel provides an additional basis for concluding that the 911 collar does not infringe claim 1 under the doctrine of equivalents. Because the 911 and modified 911 collars do not infringe independent claim 1 under the doctrine of equivalents they also do not infringe any of the dependent claims under the doctrine of equivalents.

Because the neck encircling band of the modified 911 collar is the same as the 911 collar, the Court also finds that the modified 911 collar does not infringe claim 1 or claim 4 under the doctrine of equivalents. The Court thus finds it unnecessary to reach Tecnol's contention that the modified 911 chin support brace provides an additional basis for finding that the modified 911 collar does not infringe claim 1 or claim 4 under the doctrine of equivalents.

### IV. *INVALIDITY ANALYSIS*

■ A patent is presumed valid. 35 U.S.C. § 282. The party asserting invalidity has the burden of proof. *Id.* This burden is satisfied only by proving the facts establishing invalidity by clear and convincing evidence. *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 872 (Fed.Cir.1985); *Mobil Oil Corp. v. Amoco Chemicals Corp.*, 779 F.Supp. 1429, 1488 (D.Del.1991), *aff'd* 980 F.2d 742 (Fed.Cir.1992). The " 'clear and convincing' standard of proof of facts is an intermediate standard which lies somewhere between 'beyond a reasonable doubt' and a 'preponderance of the evidence.' " *Buildex Davis Core & Pad Co., Inc.*, 782 F.2d 159 (Fed. Cir.1986).

*Inc. v. Kason Industries, Inc.*, 849 F.2d 1461, 1463 (Fed.Cir.1988).

Tecnol asserts five separate invalidity arguments, each directed at some or all of the claims of the '219 patent: 1) Claim 1 and dependent claims 2, 6, 7, 9 and 10 are invalid because Garth impermissibly recaptured subject matter in the '219 reissue patent that he gave up to obtain the original '619 patent; 2) claims 1, 2, 6 and 7 are anticipated under 35 U.S.C. § 102 by the prior art Exo–Statuc collar; 3) all of the asserted claims are rendered obvious under 35 U.S.C. § 103 by the Exo–Static collar and other relevant prior art; 4) all of the asserted claims fail to meet the enablement and definiteness requirements of 35 U.S.C. § 112; and 5) the '219 patent is invalid because it was improperly reinstated by the PTO.

#### A. *Recapture Rule*

■ The purpose of a reissue proceeding is to allow a patentee to correct errors in an issued patent. *See* 35 U.S.C. § 251. However, "[e]rror under the reissue statute does not include a deliberate decision to surrender specific subject matter in order to overcome prior art, a decision which in light of subsequent developments in the marketplace might be regretted." *Mentor Corp. v. Coloplast, Inc.*, 998 F.2d 992, 996 (Fed.Cir.1993). Accordingly, courts have adopted a rule of recapture that prohibits a patentee from broadening a claim during reissue to "recapture" what he has abandoned intentionally at the insistence of the Patent office "in order to secure a patent," *Id.* at 995.

The essence of Tecnol's position is that the '619 patent included the transformability limitation and certain language indicating this limitation was removed by Garth during the reissue proceedings. The Court has previously found that the '619 patent did not contain a transformability limitation. Accordingly, the Court rejects Tecnol's recapture argument.

#### B. *Anticipation*

Title 35 U.S.C. § 102 provides in relevant part:

A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, ...

 Invalidity by reason of anticipation "requires that all of the elements and limitations of the claim are found within a single prior art reference." *Scripps Clinic & Research Foundation v. Genentech, Inc.,* 927 F.2d 1565, 1576 (Fed.Cir.1991); *see Verdegaal Bros., Inc. v. Union Oil of California,* 814 F.2d 628, 631 (Fed.Cir.), *cert. denied,* 484 U.S. 827, 108 S.Ct. 95, 98 L.Ed.2d 56 (1987); *Phillips Petroleum Co. v. United States Steel Corp.,* 673 F.Supp. 1278, 1287 (D.Del.1987), *aff'd* 865 F.2d 1247 (Fed.Cir.1989). "That which would literally infringe if later in time anticipates if earlier than the date of the invention." *Lewmar Marine Inc. v. Barient, Inc.,* 827 F.2d 744 (Fed.Cir.1987), *cert. denied* 484 U.S. 1007, 108 S.Ct. 702, 98 L.Ed.2d 653 (1988). For an invention to be anticipated, there must not be any differences "between the claimed invention and the reference disclosure, as viewed by a person of ordinary skill in the field of the invention." *Scripps,* 927 F.2d at 1576. If more than one reference is needed to establish invalidity, then anticipation under § 102 cannot be found. *Continental Can Co. v. Monsanto Co.,* 948 F.2d 1264, 1267 (Fed.Cir.1991). Anticipation is a question of fact, *Scripps,* 927 F.2d at 1576, which may best be resolved by performing a step by step comparison of the Exo–Static collar with the asserted claims, keeping in mind at all times that the claims cannot be construed differently for invalidity issues than they were for infringement issues. *Beachcombers v. WildeWood Creative Prods., Inc.* 31 F.3d 1154, 1163 (Fed.Cir. 1994).

### 1. *Claim 1*

#### a. *Preamble*

 The preamble claims a cervical collar. The Exo–Static is a cervical collar. CalMed attempts to distinguish the Exo–Static by labelling it a "post-hospital use" collar as opposed to an "extrication collar."

The distinguishing factor, albeit an unquantified one, which CalMed uses to divide cervical collars into these sub-categories, is the amount of support they provide. This is a distinction that is not supported by the language of the claims, and the Court may not read additional limitations into the claims in order to avoid invalidating the patent.

#### b. *Subparagraph (a)*

As the Court has discussed previously claim 1 uses unusually restrictive language, i.e., "formed entirely of" in claiming the neck encircling band. The Exo–Static collar discloses a multi-piece neck encircling band with metal struts. Tecnol argues these differences do not preclude anticipation because one of the pieces in the Exo-static band is long enough to extend around the patient's neck and thus standing alone discloses all the elements of the claimed band. But this one piece, when viewed in context of the Exo–Static reference as a whole, is not the Exo–Static "band." The Exo–Static band requires multiple plastic pieces, and derives structural support from generally vertical metal struts.

Tecnol attempts to diminish the significance of the metal struts by labelling them "additional features," seeking to invoke the well-established principle that additional features are not relevant to questions of infringement or anticipation. While this argument has surface appeal, it ignores the clear steps Garth took to distinguish his neck encircling band from the prior art.

The prior art cited by the examiner during the prosecution disclosed bands which were similar to the uncited Exo–Static band. Specifically, Grassl disclosed a band quite similar to the Exo–Static, in that it had two pieces, each of which were "neck-encircling," but which contained structural elements which were not formed of stiff, flexible plastic sheet material. As discussed during the Court's infringement analysis, Garth distinguished the band of his invention quite clearly from such collars. Indeed, it was this distinction by Garth which formed the basis for the Court's construing the claims in such a manner that precluded a finding of literal infringement.

This is why the metal struts and additional plastic pieces of the Exo–Static collar cannot be viewed as merely "additional features." Garth had such band structures in mind and was intentionally distinguishing his claims from them. Eyrick testified on cross-examination that in fact the 911 sizing post is distinguishable from the Exo–Static metal supports because the sizing post provides "circumferential" support and the Exo–Static metal struts provides "height" support. Eyrick contended that it would be "obvious to someone that you could produce these in a plurality of sizes without the need for the metal brackets." [Eyrick Tr. at 2004]. "Obviousness" is not part of an anticipation analysis. To anticipate, *every* element must be disclosed in the prior art reference. The Court may only fill in a gap in a prior art reference for purposes of anticipation if the missing information is "inherent" in the prior art reference. *Continental Can Co. USA, Inc. v. Monsanto Co.*, 948 F.2d 1264, 1268–69 (Fed.Cir.1991). There is no "gap" in the Exo–Static reference, only a specific band disclosure which Tecnol wishes to replace with a separate band disclosure. The Court finds that every element of subparagraph (a) is not present in the Exo–Static reference.

### c. *Subparagraph (b)*

Eyrick testified, and Garth and Ryan conceded, that the Exo–Static chin support brace is generally C-shaped, and is formed entirely of stiff, flexible plastic sheet material. [Eyrick Tr. at 1949; Garth Tr. at 725, 727; Ryan Tr. at 169–70]. The parties did not agree, however, regarding whether the Exo–Static chin support brace had "fastening means located on each end of said brace as required by subparagraph (b)."

Eyrick testified that the Exo–Static collar utilizes thread as a fastening means which is engageable with cooperative attachment means consisting of holes on the front and side portions of the neck encircling band. [Eyrick Tr. at 1949]. In response, CalMed asserts that "[t]he Exo–Static collar does not satisfy element (b) because unlike the plastic rivets in the patent and the 911 collar, the thread is not a fastener at each end of the chin support." [CMAB at 12]. CalMed's

argument is unpersuasive. The claim itself, as opposed to the Stifneck, uses means-plus-function language pursuant to 35 § 112 ¶ 6 to claim "fastening means," not a "fastener." Thread is indisputably a means for fastening. The '219 patent claims fastening means "at least" on the ends of the chin support brace, not "only" on the ends of the chin support brace. The fact that the thread is located not only at the ends of the chin brace, but also between the ends and all along the chin support brace, does not take the thread outside the scope of paragraph (b) of claim 1. This does not end the Court's inquiry into the thread fastening means, however, because the thread still must be able to perform the functions assigned to the fastening means in subparagraph (c).

### d. *Subparagraph (c)*

As construed by the Court, the means-plus-function fastening means elements claim structures which perform the function of fastening, aligning, and bowing the chin support brace. These functions may be performed during the manufacturing process. As a result of these functions being performed, the claimed chin support brace obtains an "upwardly inclined, conically convex" shape and is "supported along its entire length by the upper edge of the front portion of [the] band and projecting forwardly therefrom." Eyrick testified, and the Court so finds, that as the thread goes through the holes in the Exo–Static collar during manufacture, fastening the chin support brace to the band, the chin support brace is bowed and formed into the upwardly inclined, conically convex shape which is clearly present in the Exo–Static collar. [Eyrick Tr. at 1949–50].

In response, CalMed contends that the Exo–Static band does not have attachment means separate from the brace because the band does not have holes until the thread is passed through the band during manufacture. CalMed claims that the claimed invention is different in that the band has pre-formed holes through which the fastening means engages. Even assuming *arguendo* that CalMed's characterization of the holes in the Exo–Static collar is true, the timing of the creation of the holes is irrelevant in a product claim. What does matter is that the

holes exist in the finished product and interact with the fastening means to perform the required functions. The claims require that the fastening means are "engageable" with the respective attachment means. The thread of the Exo–Static chin brace is clearly engageable with the holes in the Exo–Static band.

Finally, CalMed contends that the Exo–Static collar does not satisfy subparagraph (c) because it does not disclose a chin brace which is "supported along its entire length by the upper edge of the front portion of the band." During manufacture, the inner edge of the Exo–Static chin piece is placed on the inside of the Exo–Static band and fastened with thread along the entire length of the inside of the front portion of the chin support brace. After the chin piece is fastened, approximately three-eighths of an inch of the chin piece is directly behind the band and the remainder of the chin support brace projects forward from the front portion of the band. This three-eighths inch mark is easily recognizable because the Exo–Static chin piece contains a line of perforations which enables the plastic to bend easily at this point. [See DX 1400]. After the chin piece is attached, a tube of foam padding is sewn along the edge of the band at its back and side and continuing across the front of the chin piece. [DX 210].

CalMed spent significant effort at trial attempting to establish through Garth's testimony that the Exo–Static chin piece does not derive *any* support from the front edge of the Exo–Static band. First, Garth testified that the chin piece is not in contact with and thus derives no support from the upper edge of the band when the collar is not loaded, i.e., not on a patient. [Garth Tr. at 519–520]. This testimony serves only to set the stage for the loading of the collar, which the Court has previously determined is the state in which "supported along its entire length" must be judged.

Before analyzing what exactly occurs when the Exo–Static collar is loaded, however, the Court must first clarify what subparagraph (c) claims. At times, CalMed seems to argue that subparagraph (c) claims a chin support brace that derives its *entire support*, i.e.—*all*

of its support, from the upper edge of the band. As Eyrick testified, this is not the same as "supported along its *entire length*" as subparagraph (c) requires. [Eyrick Tr. at 1988 (emphasis added) ]. Thus, anticipation (or infringement) may not be avoided simply because a prior art reference (or accused product) derives support for the chin piece from other structures *in addition* to the upper edge of the band. All that is required is that *some* portion of the chin piece's support is derived from the upper edge.

Tecnol contends that "the record is clear that the upper edge of the band of the Exo–Static collar provides at least some support to the chin support brace," [TOB at 8], citing the following testimony of witnesses for both parties:

> [T]he chin rest is supported along its entire length by the upper edge of the front portion ... of the band.

[Eyrick Tr. at 1950].

> Q: And is it correct that in the position around the patient's neck, so when [the Exo–Static collar] is in a cylindrical configuration, that this device provides some support by virtue of the upper edge of the neck encircling band to the chin support brace?
>
> A: I'm certain it must provide some support. How much, I'm not certain.

[Ryan Tr. at 177].

Garth testified that the encircling band is deflected inward when the chin piece is loaded. [Garth Tr. at 521]. The Court's careful observation of the demonstrations performed upon the Exo–Static collar, [PX 210], by the various witnesses during trial, coupled with the Court's examination of the collar, leads the Court to conclude that this inward deflection occurs because of the manner in which the chin piece is attached to the band. The back edge of the chin piece lies flat against the inside of the band and is attached with thread. This back edge pulls away from the band as the chin piece is loaded, causing this inward deflection of the band. As the chin piece moves downward, the perforations in the chin piece, which are located right along what would be the point of contact between the chin piece and the band allow the chin

piece to immediately bend along the perforated line. As the chin piece deflects, the foam tubing also provides some resistance to the downward motion of the chin brace, thereby providing some support to the chin support brace.

At no time during this loading process does the chin piece appear to rest against the top edge of the band. No support is provided in the "Bible on a cylinder of paper" fashion claimed by Garth. This conclusion was demonstrated even more clearly by an experiment performed by Garth at trial. Garth took an Exo–Static collar and cut through the supportive foam tubing. [Garth Tr. at 883–886]. With this support factor out of the picture, it became even more clear that as the chin piece is loaded it simply folds over at the perforated line and does not in fact derive any support from the top edge of the band.

After careful consideration of all the testimony and evidence, the Court finds that Tecnol has failed to prove that the Exo–Static chin piece derives any support from the top edge of the neck encircling band as claimed in the '219 patent.[22] Thus, the Exo–Static collar does not anticipate either claim 1 or claim 4.

### e. *Subparagraph (d)*

CalMed does not dispute that the claimed retention means are disclosed in the Exo–Static collar. [See CMAB at 11].

### 2. *Dependent Claims 2, 6 and 7*

Because the Exo–Static collar does not anticipate independent claim 1, it also does not anticipate dependent claims 2, 6 or 7. *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1255 n. 4 (Fed. Cir.1989); *RCA Corp. v. Applied Digital Data Systems, Inc.*, 730 F.2d 1440, 1446 (Fed.Cir.1984).

### 3. *Claim 4*

Claim 4 does not differ from Claim 1 with respect to subparagraph (c). Accordingly, the Court's finding that the Exo–Static collar does not anticipate claim 1 because the Exo–Static chin piece is not supported along its entire length by the upper edge of the front portion of the neck encircling band is equally applicable to Claim 4.

The Court finds that the Exo–Static collar does not anticipate claim 4 because it does not disclose a neck encircling band that closes at the side of a patient's neck as is claimed in claim 4. As discussed previously, the Exo–Static discloses a multi-piece band and as such does not disclose the "integral" band claimed in claim 4.

### C. *Obviousness*

■ A patent may also be invalidated for obviousness under 35 U.S.C. § 103. Under § 103, a Court must determine whether "the subject matter as a whole would have been obvious at the time the invention was made."[23] Obviousness is a question of law

---

22. So that the record is clear, the Court has not relied in any way upon a second experiment performed by Garth on the Exo–Static collar during CalMed's rebuttal case.

On rebuttal, CalMed produced an Exo–Static collar which had been altered by Garth. Garth had removed the thread fastening the chin piece to the inside of the band, and reattached the chin piece with the chin piece now sewn to the outside of the band. [PX 570]. Garth testified that the support provided to the chin piece of the altered Exo–Static collar, which could not possibly be supported by the top edge of the band, was no different than the support provided to the chin piece in the real Exo–Static collar. Garth thus concluded that the upper edge of the Exo-static band did not provide any support to the Exo–Static chin piece. [Garth Tr. at 2176–2179].

Tecnol objected to this demonstration at trial as improper on the grounds that it should have been disclosed during discovery or during the pre-trial proceedings. This demonstration is of little probative value because it does not allow the Court to observe the interaction (actually, lack of interaction) between the upper edge of the band and chin piece in their true orientation. The other evidence cited previously by the Court is of far greater relevance and fully supports the Court's conclusions. Because Garth's rebuttal experiment has not been relied upon by the Court Tecnol's objection is moot.

23. Section 103 provides in pertinent part:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention

based upon factual inquiries established by the United States Supreme Court in *Graham v. John Deere*, 383 U.S. 1, 17, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966). *See Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1566–68 (Fed.Cir.), *cert. denied*, 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987); *Loctite*, 781 F.2d at 872; *Phillips Petroleum*, 673 F.Supp. at 1312. The factors to consider in determining whether obviousness is present include: 1) scope and content of the prior art; 2) differences between the prior art and the subject patent; 3) level of ordinary of skill in the art at the time of the invention; [24] and 4) secondary considerations such as commercial success, long felt but unresolved need, failure of others. *Graham*, 383 U.S. at 17, 86 S.Ct. at 693–94; *Loctite*, 781 F.2d at 872; *Mobil*, 779 F.Supp. at 1494. When performing an obviousness analysis, "[f]ocusing on the obviousness of substitutions and differences, instead of on the invention as a whole, is a legally improper way to simplify the often difficult determination of obviousness." *Gillette Co. v. S.C. Johnson & Son, Inc.*, 919 F.2d 720, 724 (Fed.Cir.1990). The Court may not, with 20–20 hindsight, utilize Garth's claims as a template and reconstruct his invention willy-nilly by picking and choosing elements at will from the prior art. *See In re Gorman*, 933 F.2d 982, 987 (Fed.Cir. 1991). The "critical question, as § 103 makes plain, is whether the invention as a whole would have been obvious to one of ordinary skill in the art at the time it was made." *Perkin–Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 894 (Fed.Cir.), *cert. denied*, 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984).

██ The following patents constitute prior art under 35 U.S.C. § 102(b), as being patented in this country more than one year prior to the application date for the '619 patent: Applegate [PX 222]; Bond [PX 221], Grassl [PX 219], McFarlane [PX 225]; McKinley [PX 224]; Monfardini [PX 223]; Moore [PX 551]. The Exo–Static (PX 210), Thomas (PX 529) and Hare (PX 528) collars constitute prior art under 35 U.S.C. § 102(b) as products which were in public use and on

sale in this country more than one year prior to the application date for the '619 patent. Tecnol's trial exhibits 33, 252, and 37 also constitute prior art under 35 U.S.C. § 102(b) as printed publications dated more than one year prior to the '619 application date.

The Court has found that the Exo–Static collar does not disclose a chin support brace that is supported along its entire length by the upper edge of the front portion of the neck encircling band as claimed in claims 1 and 4. Tecnol does not contend that any other prior art reference discloses a cervical collar with this novel relationship between band and chin support brace. Accordingly, the Court finds Tecnol has failed to prove that the prior art renders any of the claims of the '219 patent obvious. Therefore, the Court need not reach the questions of whether the use of side closure bands or one piece bands are disclosed in the prior art. The Court also need not resolve the disputed issues regarding the other objective evidence presented by CalMed in support of a finding of nonobviousness, i.e. the secondary considerations.

### D. *Enablement and Definiteness*

Tecnol asserts that if certain terms used in the claims are construed as CalMed contends then the claims are rendered invalid because 1) the specification is not enabling and/or 2) the claims are indefinite.

#### 1. *Enablement*

██ Under the enablement requirement of 35 U.S.C. § 112, the specification must contain a written description of the invention, and of the manner of making and using it, that is in such clear terms as to enable any person skilled in the art, relying on the specification and knowledge in the art, to make and use it without undue experimentation. *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1571 (Fed.Cir.1991). The scope of the enablement must be commensurate with the scope of the claims. *Amgen, Inc. v. Chugai Pharmaceutical Co.*,

---

was made to a person having ordinary skill in the art to which said subject matter pertains. 35 U.S.C. § 103.

**24.** The parties' agreed upon statement regarding the level of ordinary skill in the art is presented *supra*, n. 17.

927 F.2d 1200, 1212 (Fed.Cir.), *cert. denied* 502 U.S. 856, 112 S.Ct. 169, 116 L.Ed.2d 132 (1991).

CalMed has construed the '219 patent so as to cover collars that have 1) a permanently attached chin piece, as in the 911 and modified 911 collars; 2) permanently attached front and back band portions, as in the 911 and modified 911 collars; 3) a one-piece "band" that does not encircle the patient's neck; and 4) a pre-formed three-dimensional chin piece, as in the modified 911 collar. Tecnol contends that if CalMed's claim construction is correct then the claim is rendered invalid because it runs afoul of § 112's enablement requirement. With respect to the second, third, and fourth items, the Court has not adopted CalMed's claim construction as part of the Court's infringement analysis,[25] thus rendering Tecnol's enablement argument moot.

◼ With respect to the first item, however, the Court has construed the claims as covering a cervical collar with a permanently attached chin support brace. Tecnol contends that nothing in the specification would teach one of ordinary skill in the art to make a collar with a fixed chin piece. [Eyrick Tr. at 1952–53; Preston Tr. at 1823]. The specification, however, specifically teaches that either permanent or temporary fastening means may be used to secure the chin support brace to the collar. [PX 521 at 2:47–60]. It would have been well within the knowledge of one skilled in the art that if one side could be permanently fastened so could the other. The Court finds that any person skilled in the art, relying on the '219 patent, could make a collar with a permanently attached chin piece without undue experimentation. The Court finds, therefore, that no claim of the '219 patent is invalid for lack of enablement.

### 2. Definiteness

◼ Under the statutory requirement of definiteness, the claims must "particularly [point] out and distinctly [claim] the subject matter which the applicant regards as his invention. 35 U.S.C. § 112 ¶ 2. The standard for definiteness is whether, when the claim is read in light of the specification, one skilled in the art would understand what is claimed. *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.,* 806 F.2d 1565, 1576 (Fed.Cir. 1986).

◼ Tecnol contends that CalMed's construction of the terms "entirely", "elongated neck encircling band", "generally C-shaped", "integral with", and "supported along its entire length" is inconsistent with the ordinary meaning of these terms and that the specification of the '219 patent does not provide any special definition of these terms. For this reason, Tecnol contends that the claims are indefinite if CalMed's construction of these terms is adopted by the Court.

With respect to the terms "entirely" and "integral with", the Court has not adopted CalMed's claim construction, thus rendering Tecnol's definiteness argument moot. With respect to the terms "elongated neck encircling band", "generally C-shaped", and "supported along its entire length", the Court has construed these terms previously as a matter of law as part of the Court's infringement analysis. Incorporating this previous analysis by reference, the Court finds that the Court's construction of these terms do not render the patent indefinite.

### E. Improper Reinstatement

In addition to the more common invalidity defenses discussed above, Tecnol also contends that the '219 patent is invalid because it was improperly reinstated by the PTO following the lapse of the patent for failure to pay maintenance fees. [Tecnol's Third Amended Answer and Counterclaim, D.I. 125, ¶ 18(a).].

Section 41 of the Patent Act provides for fees to be paid by patent applicants. In

---

**25.** With respect to the fourth item, a pre-formed three-dimensional chin piece, such as is found in the modified 911 collar, the Court found in its literal infringement analysis that the claims of the '219 patent do not cover such a chin piece because at no point in time may such a chin piece be described as "generally C-shaped" as required by the claims. The Court found it unnecessary to reach the issue of the modified 911 chin piece in its doctrine of equivalents infringement analysis.

1980, the fee structure was amended to require, *inter alia*, the payment of periodic maintenance fees on patents. 35 U.S.C. § 41(b). The legislative history reflects that the 1980 amendments were made in order to allow the PTO to derive greater financial support from the primary users of its services, patent applicants and patent holders. *See Laerdal Medical Corp. v. Ambu, Inc.,* 877 F.Supp. 255 (D.Md.1995) (collecting and discussing legislative history); *see also* 3 Donald S. Chisum, *Patents* § 11.02[1] at 11–25 to 11–27 (1994). A patent expires, or "lapses", if the maintenance fee is not paid within the six month "grace period" following the maintenance fee due date.

The '619 patent was issued on November 8, 1983. Pursuant to 35 U.S.C. § 41(b), the first maintenance fee was due on May 8, 1987. On August 5, 1986, the PTO approved the '219 reissue patent. The approval of a reissue patent does not change the maintenance fee schedule which still runs from the issue date of the parent patent. The deadline for the first maintenance fee, therefore, continued to be May 8, 1987. For reasons which are discussed below, no attempt was made by Garth or his patent attorney, Robert Strauss, to pay the May 8, 1987 maintenance fee until January 23, 1990, nearly three years after it was due. The PTO rejected the maintenance fee because the '219 patent had lapsed.

Title 35, section 41(c) governs reinstatement of a lapsed patent, and in 1990 that section provided in relevant part that "[t]he Commissioner may accept the payment of any maintenance fee required by [35 U.S.C. § 41(b) ] after the six-month grace period if the delay is shown to the satisfaction of the Commissioner to have been unavoidable." [26] Garth filed a petition to reinstate the '219 patent which, after several rejections and petitions for reconsideration, was granted by the PTO on February 27, 1991. In reinstating the '219 patent the PTO found that "the

delay was unavoidable since reasonable care was taken to ensure that the maintenance fee would be timely paid." It is this finding of "unavoidability" by the PTO that Tecnol seeks to have this Court overturn.

Each party submitted pre-trial briefs on this issue. [D.I.'s 115, 116, and 118].[27] At trial, additional testimony was given by Garth and Strauss, and the parties provided some further limited argument in their post-trial briefing [D.I.'s 149 at 17–19 and 150 at 24–28].

■■■ The first step in the Court's analysis must be to determine whether Tecnol has standing to make this challenge. The Federal Circuit has been presented with this issue only tangentially in *Chapman v. Manbeck,* 931 F.2d 46 (Fed.Cir.1991). One of Chapman's patents had lapsed for failure to pay a maintenance fee pursuant to 35 U.S.C. § 41(b), and the Commissioner of the PTO denied two petitions by Chapman to reinstate the patent pursuant to 35 U.S.C. § 41(c). Chapman brought suit in the Eastern District of Virginia to compel the Commissioner to reinstate the patent. The Virginia District Court granted summary judgment in favor of Chapman and ordered the Commissioner to reinstate Chapman's patent. *Id.* at 47.

Three days after the summary judgment ruling, Chapman amended his complaint in a previously filed patent infringement lawsuit in the District of New Jersey to charge the defendant, Desmar Corporation, with infringement of the newly reinstated patent. A New Jersey magistrate judge issued an order *sua sponte,* which was later upheld by the New Jersey District Court, which precluded Desmar from raising a lapsed patent defense against the new infringement claim. *Id.*

Desmar attempted to intervene in Chapman's suit against the Commissioner so that he could appeal the Virginia District Court's

---

26. Section 41(c) was subsequently amended in 1992, but the amended section is not applicable to the reinstatement of Garth's patent.

27. CalMed has moved to strike the pre-trial reply brief filed by Tecnol, [D.I. 118], on the grounds that it was not authorized by the Court's briefing

schedule, [D.I. 124]. While this is true, the Court will nevertheless accept the brief. CalMed will suffer no prejudice from this ruling, because had the Court struck the reply brief the Court would have allowed Tecnol to make its response in the post-trial briefing.

summary judgment decision. The Virginia District Court found that Desmar satisfied the interest requirement of Federal Rule of Civil Procedure 24,[28] but found that interest would not be impaired if the motion to intervene was denied.[29] [*Id.*] The Federal Circuit affirmed the Virginia District Court's denial of Desmar's motion to intervene on the grounds that the Virginia District Court's findings did not bind the New Jersey District Court, and that if the New Jersey District Court refused to entertain Desmar's lapsed patent defense, that decision could be appealed to the Federal Circuit. [*Id.* at 48]. The Court views the Federal Circuit's decision as resting on the availability of future appellate review of the lapsed patent defense, and not as an endorsement of such a defense.

The standing issue has been more specifically addressed in a district court decision involving the '219 patents, *Laerdal Medical Corp. v. Ambu, Inc.,* 877 F.Supp. 255 (D.Md. 1995), in which the district court held that the accused infringer, Ambu, could not assert improper reinstatement of the '219 patent as an affirmative defense because section 41(c) did not create an implied cause of action. *Id.* at 259–60. While the district court's analysis is discussed in part below, the Court notes that Tecnol was not a party in the Ambu litigation and the *Ambu* decision has no preclusive effect in the case *sub judice.*

Tecnol characterizes their improper reinstatement challenge as an affirmative defense. [D.I. 118 at 1–2]. Section 282 of the

Patent Act sets forth the affirmative defenses available to an accused infringer:

(1) Noninfringement, absence of liability for infringement, or unenforceability,

(2) Invalidity of the patent or any claim in suit on any ground specified in part II of this title as a condition for patentability,

(3) Invalidity of the patent or any claim in suit for failure to comply with any requirement of sections 112 or 251 of this title,

(4) any other fact or act made a defense by this title.

See *J.P. Stevens & Co. v. Lex Tex Ltd.,* 747 F.2d 1553, 1561 (Fed.Cir.1984).

If Tecnol's reinstatement challenge does not fit into one of these categories it may not be raised as an affirmative defense. It is not one of the paragraph 1 defenses of noninfringement, absence of liability for infringement, or "unenforceability", which includes equitable defenses such as laches, estoppel, unclean hands, and inequitable conduct.[30] *Id.* It does not fall within the scope of the paragraph 2 invalidity defenses because section 41 is in part I of title 35, not part II. It is not one of the specific sections set forth in paragraph 3.

The only other alternative is the catch-all provision of paragraph 4: "any other fact or act made a defense by this title." Section 41 does not expressly make improper reinstatement a defense. The Court must determine, therefore, whether such a defense may be implied, which requires the Court to apply the four-part inquiry of *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).[31]

---

**28.** Rule 24(a) states in relevant part:

Upon timely application anyone shall be permitted to intervene in an action . . . when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

**29.** Because the Virginia District Court decision was unpublished, the Court must rely upon the Federal Circuit's summary of the decision.

**30.** The Court expresses no opinion as to whether misrepresentations made by a patent holder in a reinstatement petition under section 41(c) could

constitute inequitable conduct. Tecnol has not alleged inequitable conduct, and even if the Court were to infer such an allegation, the record in this case would not support such a finding.

**31.** The four factors to consider in determining whether to recognize an implied cause of action are: (1) whether the plaintiff is "one of the class for whose *especial* benefit the statute was enacted;" (2) whether any "indication exists of legislative intent, explicit or implicit, to create a remedy or deny one;" (3) whether an implied remedy is consistent with the underlying purpose of the legislative scheme; and (4) whether the cause of action is one that is "traditionally relegated to state law, so that it would be inappropriate to infer a cause of action based solely on federal law." *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975).

The *Cort* analysis presented in *Laerdal Medical Corp. v. Ambu, Inc.*, 877 F.Supp. 255, 259 (D.Md.1995), is well-reasoned and persuasive. The Court adopts the reasoning in Part IV of that decision, and holds that section 41 does not create an implied cause of action. Tecnol may not, as a matter of law, assert an affirmative defense of improper reinstatement.

In the alternative, even if the Court were to find that Tecnol could raise improper reinstatement as an affirmative defense, the Court would nevertheless affirm the PTO's reinstatement of the '219 patent on the merits.

■■■ The first issue which must be resolved in analyzing the merits of Tecnol's improper reinstatement defense is the level of deference to be shown to the PTO's determination that the failure to pay maintenance fees was "unavoidable." CalMed contends that the Court may only overturn the PTO's decision if it is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law" pursuant to 5 U.S.C. § 706(2)(A). In support of its position, CalMed relies upon *Rydeen v. Quigg*, 748 F.Supp. 900 (D.D.C.1990), *aff'd* 937 F.2d 623 (Fed.Cir.1991), *cert. denied*, 502 U.S. 1075, 112 S.Ct. 974, 117 L.Ed.2d 138 (1992) which involved an appeal by a patent holder of a PTO decision denying reinstatement of a lapsed patent. *See also Ray v. Lehman*, 55 F.3d 606 (Fed.Cir.1995). *Rydeen* and *Ray* both involved direct appeals by patent holders from decisions of the PTO pursuant to the Administrative Procedures Act. Tecnol contends that such direct appeals are distinguishable from collateral attacks brought by alleged infringers, such as Tecnol, as a defense in patent litigation. Tecnol argues that this distinction justifies using a *de novo* standard of review in this case.

If, as the Court is assuming in this section of its analysis, Tecnol's improper reinstatement claim is a cognizable validity defense, then the Court must act in its role as "the final arbiter of patent validity and, although courts may take cognizance of, and benefit from, the proceedings before the patent examiner, the question is ultimately for the court[ ] to decide, without deference to the rulings of the patent examiner." *Quad Envt'l Technologies Corp. v. Union Sanitary Dist.*, 946 F.2d 870, 876 (Fed.Cir.1991). To do otherwise would potentially saddle an accused infringer with an administrative record he had no part in creating, because in appeals under 5 U.S.C. § 706(2)(A) the district court is in most instances limited to reviewing the record placed before the administrative agency.

The record in this case is not materially different from the record put before the PTO, and upon careful and independent review of the factual record and the legal requirements for a finding of unavoidability, the Court concurs with the PTO's reinstatement of the '219 patent. Having made this determination without deference to the PTO's decision, the Court notes that this decision would certainly be no different if the Court had applied the highly deferential "arbitrary and capricious" standard of review.

1. *"Unavoidable"—The Legal Standard*

■■■ A patent owner's failure to pay a maintenance fee may be considered to be unavoidable if the patent owner "exercised the due care of a reasonably prudent person." *Ray v. Lehman*, 55 F.3d 606, 608–09 (Fed.Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 304, 133 L.Ed.2d 209 (1995). This determination is to be made on a "case-by-case basis, taking all the facts and circumstances into account." *Smith v. Mossinghoff*, 671 F.2d 533, 538 (D.C.Cir.1982). Unavoidable delay under 35 U.S.C. § 41(b) is considered to be the same standard as that for reviving an abandoned application under 35 U.S.C. § 133. *In re Patent No. 4,409,763*, 7 U.S.P.Q.2d 1798, 1800 (PTO Comm'r 1988).

2. *Relevant Facts* [32]

The '219 reissue patent issued on August 5, 1986. [PX 228, PX 520]. On August 12,

---

**32.** In the pre-trial briefing on this issue, both parties relied extensively upon the documents, including declarations, placed before the PTO. At trial, however, Tecnol objected to the admission of much of this evidence except for the limited purpose of showing what was put before the PTO. CalMed agreed to this limitation. Accordingly, the Court is relying in its analysis

1986, Strauss forwarded the patent to Garth with a cover letter, informing Garth, *inter alia,* that the first maintenance fee was due on May 8, 1987. [PX 200]. The letter also stated that the second and third maintenance fee payments were due on May 8, 1994 and May 8, 1998, respectively. [*Id.*]. These last two dates were incorrect. The letter was prepared by Eveleth Thurber, Strauss's secretary and patent docket clerk. [Tr. at 472–73, 481–83]. The record is not clear regarding whether the dates in the letter were calculated by Thurber or given to Thurber by Strauss. [Tr. at 472–73].

In this time period, Thurber maintained a docket on an office personal computer in order to track maintenance fees. [Tr. at 444, PX 233 Ex. 1]. The general practice in Strauss's office was to docket the patents by the issue date on the face of the patent. [Tr. at 444]. In accordance with this usual practice, Thurber mistakenly docketed the '219 patent by its issue date and not by the issue date of the parent '619 patent. This mistake caused the incorrect calculation of the maintenance fee due dates on the docket sheet. The record does not reflect whether this incorrect docket entry was made before or after the preparation of the August 5, 1986 letter.

In its pre-trial reply brief, Tecnol alleges that "the PTO did not have all the relevant facts" before it when it made its decision to reinstate the patent. [D.I. 118 at 2]. Tecnol apparently is referring to Garth's testimony that he received the August 12, 1986 letter which contained the due date for the maintenance fee, but relied upon Strauss to remind him when it was actually due. Garth further testified that there was no written agreement that Strauss would accept this responsibility. This is not inconsistent, however, with the statements made to the PTO that Strauss's experience was that legally unsophisticated patent holders such as Garth counted on him to remind them of maintenance fees. [D.I. 115 at A47]. The August 12, 1986 letter was also put before the PTO, so that the PTO

was aware that at some point Garth had been apprised of the maintenance fee due date.

Shortly prior to May 8, 1987, when the maintenance fee was due, Thurber told Strauss that the maintenance fee would soon be due on the '619 patent. [Tr. at 455–57, 478–80]. Strauss informed Thurber that the original patent had been surrendered, and that the maintenance fee would be due under the reissue patent. [Tr. at 456]. Thurber then amended the docket entry for the '619 patent with the notations "reissued" and "see file." [Tr. at 455]. She apparently checked the docket sheet entry for the '219 patent, saw that the entry indicated that the maintenance fee was not due until February 5, 1990, and took no further action at that time. [*Id.* at A28].

Strauss maintained a reading file of all issued patents, [Tr. at 461], which could function as a backup system in that Strauss could determine maintenance fee due dates by reading the patents themselves.

In July, 1989, Thurber switched from the computer listing docket system to an index card docket system. [Tr. at 446–47]. The mistaken maintenance fee information was carried over into this new system. In December, 1989, this system alerted Ms. Thurber to the apparent upcoming maintenance fee due date for the '219 patent. A reminder notice was sent to Garth, Garth transmitted payment, and payment was forwarded to the PTO along with a transmittal letter. [Tr. at 449–50, PX 241, PX226]. Strauss first learned of the error in the docket system when the PTO returned the maintenance fee payment. [PX 227].

Strauss testified that his clients relied upon him to notify them when maintenance fees were due, and that he accepted that responsibility. [Tr. at 450]. Strauss also declared that he received no notice from the PTO reminding him that the maintenance fee was due, but he also testified that he did not rely upon such notices to track maintenance fee due dates. [Tr. 514].

upon the factual record developed at trial, and not upon the declarations of Strauss and Thurber. The Court notes, however, that this is merely an academic distinction, as the Court finds

that there is no material difference between that record before the PTO and the record developed at trial.

### 3. Discussion

 Tecnol advances two principal arguments in support of its argument that Garth's failure to timely pay the maintenance fee was not unavoidable.[33] First, Tecnol argues that Garth did not act as a reasonably prudent person in relying upon his counsel, Strauss, to remind him when the maintenance fee was due. Second, Tecnol argues that Strauss did not act as a reasonably prudent person in supervising Thurber, and that Garth is bound by Strauss's error.

Tecnol asserts that a patentee may not shift his responsibility to ensure that maintenance fees are timely paid to the patentee's counsel or to the PTO. [D.I. 115 at 5]. In support of this proposition, Tecnol relies upon two decisions by the PTO Commissioner, *In re Patent No. 4,409,763*, 7 U.S.P.Q.2d 1798 (PTO Comm'r 1988), and *In re Patent No. 4,461,759*, 16 U.S.P.Q.2d 1883 (PTO Comm'r 1990). These decisions indicate, however, that a patentee may in fact rely upon counsel to monitor maintenance fee due dates. The *In re '763* decision is admittedly confusing, in that it is difficult to determine when the PTO Commissioner is referring to the patentee and when he is referring to the patentee's counsel, but a close reading indicates that the decision generally refers to the patentee as "patentee" and refers to the patentee's counsel as "petitioner." Thus, while the Commissioner did state that "patentees are expected to maintain their own record systems," *id.* at 1800, he then went on to find that the delay was not unavoidable because "[t]he showing of record fails to indicate that the patentee or the petitioner [i.e., patentee's counsel] took any steps to ensure timely payment of the maintenance fee." *Id.* at 1801. Likewise, in *In re '759*, 16 U.S.P.Q.2d at 1884, the PTO Commissioner found that there was no unavoidable delay because "the record fails to establish that [patentee] *or anyone acting on behalf of patentee* took any steps to docket the due date of the maintenance fee." *Id.* (emphasis added).

Garth did not "do nothing" to ensure that maintenance fees were paid. He had previously retained Strauss to provide general representation in connection with the '619 parent and '219 reissue patents. Garth had no specific arrangement with Strauss regarding maintenance fees, but the Court finds that Garth acted as a reasonably prudent person in concluding that this would fall within the scope of representation provided by Strauss, and that Strauss would inform him when the maintenance fee payment was due.

Tecnol further contends, however, that Garth was obliged to take independent steps to track the maintenance fee due date because Strauss might have died or stopped practicing law. This argument misconstrues the duty imposed upon a patent holder. If Strauss had ceased representing Garth for some reason, Garth would have been obligated at that time to either familiarize himself with the maintenance fee requirements or retain new counsel, but Garth had no obligation at the outset to plan for every contingency no matter how speculative it might be.

Garth's reliance upon Strauss does not provide him with an absolute defense, but rather shifts the focus of the Court's inquiry to whether Strauss acted reasonably and prudently. Garth is bound by any errors that may have been committed by Strauss. *Smith v. Diamond*, 209 U.S.P.Q. 1091, 1093 (D.D.C.1981) (citing *Link v. Wabash Railroad Co.*, 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962)).

The primary control established by Strauss to track maintenance fees was the docketing system maintained by Thurber. The crucial issue is whether Strauss acted reasonably and prudently in relying on Thurber to maintain the docket system. The record does not indicate that Thurber had been an unreliable or mistake-prone employee prior to the misdocketing of the '219 reissue patent. Strauss had never before encountered a docketing error. [Tr. at 465]. Indeed, Strauss did not review the actual docketing of the '219 patent, the first reissue patent he or Thurber had handled. Standing alone, this might tend to establish a lack of

---

33. Tecnol also argues that failure to receive a reminder notice from the PTO does not constitute unavoidability, but CalMed has never contended that it did, either before the PTO or at trial.

reasonableness. Strauss had no reason to suspect such close monitoring would be necessary, however, because the maintenance fee due date had been correctly calculated in the August 12, 1986 letter to Garth. While it is true that this letter also incorrectly calculated the second and third maintenance fee dates, these mistakes appear to be math errors. They do not cast doubt upon Thurber's knowledge, if she calculated the first due date herself, or notice, if Strauss provided the due dates to her, of what starting date to use for maintenance fee calculations. When entering the '219 patent on the docket list, however, Thurber made the mistake of following the usual routine and entering the issue date of the patent in the "issue date" column. This was an error on her part, but it was not an error which Strauss, as a reasonable and prudent person, could have expected, not after the August 12, 1986 letter.

When Thurber later went to Strauss regarding payment of the maintenance fee for the '619 patent, Strauss properly advised her that payment should actually be made under the '219 patent. Thurber then checked the docket sheet, and relied upon the incorrect date. The Court finds that this subsequent reliance upon the docketing system was reasonable. The purpose of a docketing system is to be a readily accessible source of important information. It is not reasonable to expect a docket clerk, or a lawyer, to question and recalculate the information on a docket sheet every time the docket sheet is used, for that would completely negate its effectiveness.

Tecnol also contends that Strauss did not act reasonably and prudently because his backup system, his reading file, failed him. The Court finds, however, that this failure is not crucial, because the Court finds that a reasonably prudent patent practitioner need not even have a backup system. All that is required is a reliable docketing system. Strauss had such a system, and it failed him on this occasion. Moreover, Strauss did not have any knowledge that the system had failed him until the PTO returned the maintenance fee payment, well after the expiration of the grace period for the maintenance

fee payment. This distinguishes Strauss' behavior from the behavior of the attorneys in *Smith v. Diamond,* 209 U.S.P.Q. 1091 (D.D.C.1981), and *In re '763,* 7 U.S.P.Q.2d 1798, decisions in which unavoidability was not found because the attorneys had actual notice of a deadline before it expired. Once Strauss learned of the lapse, he promptly sought reinstatement.

For all these reasons, The Court concludes that failure to pay the maintenance fee was unavoidable, and that the '219 patent was properly reinstated by the PTO.

### F. *Conclusion—Invalidity*

In conclusion, the Court finds that Tecnol has failed to meet its burden of proving by clear and convincing evidence that any claim of the '219 patent is invalid.

### V. *ATTORNEY FEES*

██ "The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. A case is exceptional if "it would be grossly unfair for the prevailing party to bear the cost of litigation, or where the conduct of the losing party is marked by bad-faith or unfairness." *Interspiro USA, Inc. v. Figgie Intern., Inc.,* 815 F.Supp. 1488, 1521 (D.Del.1993), *aff'd,* 18 F.3d 927 (Fed.Cir.1994). Factors to consider in determining whether a case is exceptional include the closeness of the case and the conduct of the parties, including evidence of bad faith. *Id.*

The '219 patent is by no means a model of clear and concise patent drafting and presented numerous difficult questions of claim construction. The Court finds that this case was litigated in good faith by all parties involved. This is not an exceptional case under § 285.

### VI. *FALSE MARKING COUNTERCLAIM*

The '219 patent lapsed on November 8, 1987, upon the expiration of the six month "grace period" for payment of the May 8, 1987 maintenance fee. The '219 patent was not reinstated until February 27, 1991. CalMed's usual practice was to mark all Stif-

neck collars as patented, and this practice continued during the entire period when the '219 patent had lapsed. Tecnol has brought a false marking counterclaim against CalMed pursuant to 35 U.S.C. § 292, alleging that CalMed violated section 292 when it continued to mark Stifneck collars with the '219 patent after its patent attorney, Strauss, learned that the patent had lapsed.

In order to prove false patent marking, Tecnol must establish "(1) a marking importing that an object is patented (2) falsely affixed to (3) an unpatented article (4) with intent to deceive the public." *Mayview Corp. v. Rodstein,* 620 F.2d 1347, 1359 (9th Cir.1980). This Court has held that the '219 patent was properly reinstated by the PTO, therefore, the patent is "considered as not having expired at the end of the grace period. 35 U.S.C. 41(c)(1)." Tecnol has thus failed to establish that the Garth patent number was "falsely affixed to an unpatented article." The Court will enter judgment in favor of CalMed on Tecnol's false marking counterclaim.

## VII. *CONCLUSION*

In conclusion, after careful consideration of all the evidence in this case, the Court finds that: 1) the Tecnol 911 and modified 911 collars do not infringe any of the claims of the '219 patent, either literally or under the doctrine of equivalents; 2) Tecnol has failed to meet its burden of proving by clear and convincing evidence that any of the claims of the '219 patent are invalid; 3) this is not an exceptional case within the meaning of 35 U.S.C. § 285; and 4) CalMed did not commit false marking under 35 U.S.C. § 292.

Judgment shall be entered accordingly.